**UNITED STATES of America, Appellee,**

v.

**Ernest Leonard FRAZIER, a/k/a "Dutch" Frazier, Appellant.**

**No. 71–1520.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1972.

Decided April 17, 1972.

A. P. Fuller, Kellar, Kellar & Driscoll, Lead, S. D., for appellant.

Richard D. Hurd, Asst. U. S. Atty., William F. Clayton, U. S. Atty., Sioux Falls, S. D., for appellee.

Before MATTHES, Chief Judge, and LAY and ROSS, Circuit Judges.*

LAY, Circuit Judge.

This is an appeal from convictions involving willful assault on three counts in violation of South Dakota criminal statutes, SDCL §§ 22–18–11 and 12 (1967). Defendant is an Indian and the offenses occurred within the boundaries of the Cheyenne River Indian Reservation. Jurisdiction of the United States District Court is vested under 18 U.S.C. § 1153. The convictions are attacked on the alleged bases (1) that the government failed to show beyond a reasonable doubt that the defendant could form the necessary guilty intent despite his alleged mental incompetency and (2) that defendant should have been granted a continuance during the trial because he was not capable of aiding in defense of his case. Defendant's sentencing is also attacked on the basis that at the time he could not comprehend the proceedings. We reverse and remand for a new trial.

On April 18, 1970, there had been a bad blizzard in the White Horse, South Dakota area. The following morning Raymond Olson, an employee of the County Highway Department, was operating a grader clearing the snow. He saw the defendant walking along the road and assumed that he had had car trouble. Olson stopped the road grader and the defendant climbed inside. According to the government's testimony the defendant immediately assaulted Olson and called him several names. Olson jumped out of the grader and ran. Frazier pursued him a short distance but then went back to the grader. Olson got into a nearby pickup truck occupied by two other men. The defendant then smashed the road grader into the pickup. The three men in the pickup jumped clear just in time.

The defendant then proceeded to drive the grader into White Horse. There he met J. D. Kessling, a 63 year old mortician. Kessling had known the defendant since the latter was a little boy. They were both seated in Kessling's car visiting, when Mr. Kessling inquired as to the defendant's father. The defendant became quite agitated, telling Kessling that he hated Germans and Catholics and that the Pope was trying to take over the country. He complained about morticians because they drained blood out of Indians. Kessling's car had a Citizens Band Radio. Frazier pointed to the mike and asked him if he had squealed on him to the sheriff. Frazier then pulled the mike out of the car and began beating Kessling with it. Frazier said he was going to kill him. Several witnesses saw the defendant pull Kessling from his car and observed the defendant wildly kicking him on the ground. Kessling was seriously injured.

The defendant took the stand and testified that the assaults had been provoked. He stated that Olson had originally swore and kicked at him and that he was acting in self defense. He stated the assault on Kessling was brought on by Kessling questioning him about his father. Frazier testified, "I thought he (Kessling) was trying to steal my power."

Expert testimony was elicited by both the government and the defendant relating to the defense of insanity. Dr. T.

---

* This opinion has been adopted by the other active Circuit Judges: Mehaffy, Gibson, Heaney, Bright and Stephenson.

B. McManus testified that in his opinion the defendant did not know right from wrong; that he was driven by his emotions and that the nature of his acts and consequences were of no import to him. The government offered rebuttal testimony by Dr. Frederick M. Stark, a psychiatrist in Sioux City, Iowa. In an earlier written report following examination of the defendant, Dr. Stark had reported that he was uncertain whether the defendant could distinguish right from wrong. At trial, however, he said he thought there was a probability that the defendant knew right from wrong. He added that he did not think the defendant at the time of the assaults was acting by reason of an irresistible or uncontrollable impulse. He testified, however, that because the defendant acted in such a state of anger at the time of the assaults that he probably did not consider the consequences. Both psychiatrists made a diagnosis of schizophrenic reaction, paranoid type. Some lay testimony was adduced that after the assaults the defendant helped people out of the snow with the grader. Other witnesses established that on the evening before he had acted normally.

We have likewise considered the defendant's medical history, most of which, for reasons not made clear by the record, was not placed in evidence before the jury. However, since the issues on appeal relate to motions by the defense as to the defendant's overall competency to aid his counsel and to understand the proceedings, and this additional evidence was before the trial court, we highlight some of these historical facts.

The defendant was born June 20, 1928. He is a veteran, having served in Korea. Since 1967 he had been confined to the Yankton State Hospital in Yankton, South Dakota, on three different occasions, varying from one to four months duration. His diagnosis was always the same: Schizophrenic Reaction, Paranoid Type. He was generally admitted following some abnormal emotional behavior. On different occasions during these confinements he referred to himself as God. Before the trial the defendant continually wrote to the court making similar references. He had burned two marks on both of his feet which signified to him evidence of crucifixion. He harbored thoughts of grandeur. When last discharged, July 28, 1970, the staff psychiatrist at Yankton recommended:

"Since he is a veteran and possibly entitled to treatment in Fort Meade, that long-term hospitalization in Fort Meade or any other Veterans Administration Hospital be seriously considered for this individual's psychotic condition.

"That while he is out of the hospital he be continuously under the effects of medication of a major tranquilizer in doses similar to that given while he has been here."

On the day of his discharge, he was transferred to the Veterans Administration Hospital at St. Cloud, Minnesota. On September 10, 1970, he was there found to be "psychiatrically competent" to stand trial. Immediately thereafter the federal district court sent the defendant to Springfield Medical center for a pretrial commitment examination under 18 U.S.C. § 4246. On January 6, 1971, the Springfield staff recommended that he be adjudicated "competent on medication" for purposes of trial. After more than seven months observation the staff said that "[w]ithout medication the Staff would not know if he would regress to a state of incompetency or not . . . ."; that he needed medication for an indefinite time in the future; that he is paranoid and should be considered a chronic schizophrenic. Subsequently, on July 9, 1971, the Springfield doctors observed he had the capacity to stand trial. The trial commenced on August 10, 1971.

The trial court gave the instruction on insanity which has been traditionally used and approved in this circuit. The basic elements of this instruction are threefold:

"First, that at the time of the commission of the offense charged, the

defendant had the mental capacity and reason to distinguish between right and wrong as to each of the three offenses charged.

"Second, that at the time of the commission of the offense charged, the defendant had sufficient mental capacity and reason to understand the nature and character thereof, and the consequences of such offense.

"Third, that he did not commit the offense charged by reason of uncontrollable or irresistible impulse."

In essence this instruction is nothing more than the traditional M'Naghten rule supplemented by the volitional or irresistible impulse test. Under the M'Naghten rule the emphasis was on the defendant's cognitive ability to *distinguish* right and wrong and to *appreciate* the nature of his acts. As has been generally recognized, the fallacy of this approach emphasizes that behavior is exclusively within the domain of intellectual capacity.[1] In Pope v. United States, 372 F.2d 710 (8 Cir. 1967), vacated on other grounds 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), this court refused to find similar instructions reversible error since it was felt the rules embodied the essentials of an insanity test: cognition, volition and will. However, we invited the trial court to be "imaginative in his charge" and not be "content with the bare bones of a traditional charge." 372 F.2d at 736. In affirming this position we noted by appendix that the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth

and Tenth Circuits were still following variations of M'Naghten and the irresistible impulse rule. The First Circuit had not taken a position, although it had recommended the use of the instruction adopted by the Third Circuit in United States v. Currens, 290 F.2d 751, 774 (3 Cir. 1961), incorporating a portion of the American Law Institute Model Penal Code test. See Amador Beltran v. United States, 302 F.2d 48, 52 (1 Cir. 1962).[2] In 1966 we had available for consideration the Second Circuit's opinion in United States v. Freeman, 357 F.2d 606, 622 (2 Cir. 1966), which had adopted the ALI's alternative proposed in § 4.01 of the Model Penal Code:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law."

Likewise we were aware of what is called the *Durham-McDonald* rule from the District of Columbia Circuit:

"What psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which

---

[1] "Capacity to know the nature and wrongfulness of conduct may not have been discernibly destroyed and yet the transformations in ability to cope with the external world, worked by severe psychosis, may have otherwise destroyed the individual's capacity for self-control. In cases such as this *McNaughten* decrees legal responsibility. . . . [I]t is precisely the destruction of capacity for self-control, in consequence of mental disease or defect, which from the point of view of morals and of legal policy warrants the special treatment of the irresponsible . . . ." Interim Report of the State of New York Temporary Commission on Revision of the

Penal Law and Criminal Code, Legislative Documents, Vol. 8, 1963, p. 19 as cited in J. Marshall, Intention in Law and Society, p. 118 fn. 107 (1968).

[2] The Third Circuit standards deleted all elements of cognition by the following language:
"The jury must be satisfied that at the time of committing the prohibited act the defendant as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." United States v. Currens, 290 F.2d, supra at 774.

substantially affects mental or emotional processes and substantially impairs behavior controls." McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962).

Since Pope v. United States, supra, this circuit has had several occasions to review the rule but in each instance we chose to reaffirm the traditional rule with renewed invitations to the trial courts to broaden the essentials of the charge. We did so as late as United States v. Mills, 434 F.2d 266 (8 Cir. 1970), cert. denied 401 U.S. 925, 91 S.Ct. 908, 27 L.Ed.2d 828 (1971). Our original suggestion for expansion of the rule was either misunderstood or misplaced; in any event, the older rule has remained fixed in application by the district courts. We now once again review our position realizing we deal in a sensitive, difficult and uncertain area of the law.

In the few years since *Pope* all of the federal courts of appeals (except the First Circuit which has not yet passed on the question) have rejected the older rule. The *Durham-McDonald* rule is still in effect in the D.C. Circuit. See Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 874–875 (1954) and McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962). The rule states that an accused is not criminally responsible if his unlawful act was the product of any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. See also Carter v. United States, 102 U.S.App.D. C. 227, 252 F.2d 608, 615–617 (1957) (explaining the meaning of "product"). It is our observation that there exists in

effect little difference with this pronouncement and the American Law Institute rule. As mentioned, the Second Circuit had adopted the ALI definition in United States v. Freeman, 357 F.2d 606, 622 (2 Cir. 1966). The Third Circuit had earlier adopted the primary part of the ALI statement. United States v. Currens, 290 F.2d 751, 774 (3 Cir. 1961). *Since* our decision in Pope v. United States, supra, the Fourth Circuit has adopted the ALI Model Penal Code test in United States v. Chandler, 393 F.2d 920 (4 Cir. 1968); the Fifth Circuit has applied the ALI test in Blake v. United States, 407 F.2d 908 (5 Cir. 1969); the Sixth Circuit has adopted the first part of the ALI test in United States v. Smith, 404 F.2d 720 (6 Cir. 1968); the Seventh Circuit adopted the ALI test in United States v. Shapiro, 383 F.2d 680 (7 Cir. 1967); and the Ninth Circuit adopted the first part of the ALI test in Wade v. United States, 426 F.2d 64 (9 Cir. 1970). In Wion v. United States, 325 F.2d 420 (10 Cir. 1963), cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964), decided before *Pope,* the Tenth Circuit had earlier suggested using the ALI language.[3] Thus, all of the circuits, except our own and the First which has not passed on the question, have abandoned the M'Naghten-irresistible impulse rule and adopted the ALI test.

As the various courts of appeals have so well analyzed, there exist compelling reasons for rejecting the M'Naghten-irresistible impulse approach. We need only mention a few of those reasons here. We find the facts in the instant case demonstrable as to the inappropriateness of the so-called cognitive test. As exemplified in the instant trial, all psy-

3. Chief Judge Murrah there said:
"Thus, in Coffman [Coffman v. United States, 290 F.2d 212 (10 Cir. 1961)], we say in self-complicating language that if the accused does know that his act is wrong, yet by reason of his mental condition, his actions are beyond his control, he is not criminally responsible. . . . [A]s we have seen, Coffman is not essentially different from the A.L.I. test. This being so, we need only find words to translate our legal formula to the man-on-the-street juror, so that he may intelligently apply the test to relevant medical testimony in determining the ultimate quesion of criminal responsibility. We are content to adhere to Coffman, in the more simplified and understandable language of the A.L.I. formula." 325 F.2d at 427.

chiatric evidence under the traditional test tends to be narrow—relating only to the defendant's intellectual reasoning. This confined approach continues to occur notwithstanding our prior observation that all relevant evidence relating to a defendant's mental condition should be received. The emphasis on the right and wrong test was here erroneously formalized by the government attorney and the court in the following colloquy before the jury:

Question to Dr. Stark: "Then it's your opinion that he probably did know the difference?

"THE COURT: Did or didn't?

"Q. Did; that he probably did know the difference?

"THE COURT: Probably did know the difference?

"Q. Is that the way you expressed your opinion?

"MR. HURD: I think that's a misstatement, Your Honor. I think the expression was that he probably did have the mental capacity and reason to distinguish between right and wrong, which I believe is the legal test.

"THE COURT: Well, yes, that might be the legal test, but I think he has a right to ask it in that form by way of cross examination.

"MR. HURD: Oh; well, yes, as long as it's clear what the test is."

The central issue more relevant to the facts of the present case is whether the defendant was suffering from a mental disease which substantially impaired his ability to control his behavior so as to conform his conduct to the requirements of the law. Yet no meaningful evidence, presumably because of the traditional approach utilized by both the defense and prosecution, was offered by either side on this issue. The basic fault, therefore, in the use of the M'Naghten-irresistible impulse approach is that individuals who can meet these tests are imprisoned and later released still suffering from mental abnormalities which substantially impair controlled behavior.

See "Insanity As a Defense," A Panel Discussion, Second Circuit Judicial Conference, 37 F.R.D. 365 (1965).

The irresistible impulse test does little more than lightly touch upon the more serious question of controlled behavior. As the Second Circuit reasoned in *Freeman:*

"As it has commonly been employed, however, we find the 'irresistible impulse' test to be inherently inadequate and unsatisfactory. Psychiatrists have long questioned whether 'irresistible impulses' actually exist; the more basic legal objection to the term 'irresistible impulse' is that it is too narrow and carries the misleading implication that a crime impulsively committed must have been perpetrated in a sudden and explosive fit. . . . In seeking one isolated and indefinite cause for the every act, moreover, the test is unhappily evocative of the notions which underlay M'Naghten—unfortunate assumptions that the problem can be viewed in black and white absolutes and in crystal-clear causative terms." 357 F.2d at 620–621.

The main difficulty with the term "irresistible impulse" is the misleading implication given to everyone who must apply it, from the expert witness to the trier of fact. The history of the "impulse" test indicates that its original usage was intended to cover not only the sudden act but one brought on by a long brooding disease as well. The primary origin of the rule was to broaden the definition of insanity to include acts brought on by internal irrational compulsion. If the will to totally resist impulse was destroyed the defense was made available, even though a person appreciated the difference between right and wrong. Cf. Pollard v. United States, 285 F.2d 81 (6 Cir. 1960); Smith v. United States, 59 App.D.C. 144, 36 F.2d 548 (1929). Its usage, however, as Judge Bazelon observed in the *Durham* case, fails in affording proper meaning. Common understanding of the terms relate only to sudden,

momentary and spontaneous acts. See Webster's New International Dictionary 1138 (3d ed. 1966). This led the Ninth Circuit in Maxwell v. United States, 368 F.2d 735, 741 n. 9 (9 Cir. 1966), to define it in terms of an "uncontrollable act." Since *Durham* severe criticism of its use has followed. See Wade v. United States, supra 426 F.2d at 67. And now as indicated, with the exception of this circuit, the term has been totally abandoned by all of the federal courts.

Clarity is the true virtue of effective communication. Although language of instructions may include the "bare bones" of the insanity tests (cognition, volition (choice) and will) if it fails to properly communicate the intended legal meaning the law serves an absurd end.

Another basic fault of the irresistible impulse charge is the attempt to define it by absolute terms which are now considered ill-conceived. The charge states that the government has the burden to prove the three essentials: (1) the right and wrong test, (2) the "intent of the act" test and (3) the irresistible impulse test. The latter phrase is further amplified by the instruction that if the defendant's "will—the governing power of his mind—has been so completely destroyed that his actions are not subject to it, but are beyond his control," then he may be found insane. Thus, irresistible impulse, relating to volition and will, is equated with the *complete* destruction of the governing power of the mind. Significantly, all of the other circuits (except the First Circuit which has not passed on the question) have recognized that one need not have total incapacity of will to be found criminally irresponsible.[4] Therefore, we conclude that the test previously approved by this court and as given by the trial court in the instant case is not only misleading but it is incorrect as well.

We need not repeat all of the pros and cons of rejecting the M'Naghten-irresistible impulse rule and adopting the ALI rule. These are more than adequately discussed in the opinions cited. Upon review, we simply find that the substance of the ALI rule invites a broader medical-legal investigation, provides improved means for communication by medical specialists,[5] offers a better basis for understanding of complex issues by triers of fact and overall serves the desired end in the administration of our criminal laws.

The field of behavioral science is undergoing constant reexploration. The district courts should always be alert to receive relevant evidence and to invoke imaginative instructions which will improve communication to and understanding for the trier of fact. By our adoption of the ALI instruction we acknowledge there can be leeway in the language and further refinement may be necessary.[6]

4. As the Fifth Circuit recently recognized: "A substantial lack of capacity is a more nearly adequate standard." Blake v. United States, supra, 407 F.2d at 915. In this regard the Ninth Circuit observed that "the A.L.I. phraseology is more consonant with usual medical testimony than is that of the more narrow tests." Wade v. United States, supra, 426 F.2d at 71. In United States v. Shapiro, supra, 383 F.2d at 685, the Seventh Circuit observed "absolutes are not realistic and that the ALI approach is preferable."

5. The ease of communication is a chief factor in favor of the ALI test. And as has been noted, the psychiatrist is in a better position to render his professional opinion under these tests. See Leifer, "The Psychiatrist and Tests of Criminal Responsibility," 19 American Psychologist, 828 (Nov. 1964). In Bradley v. United States, 447 F.2d 264 (8 Cir. 1971), the government psychiatrist refused to answer the "right and wrong" question by saying he did not know what the question meant. See Blake v. United States, supra, and Wade v. United States, supra.

6. We echo Chief Judge Haynsworth's appraisal in United States v. Chandler, supra, 393 F.2d at 926–927.
"We ought not fall into the egregious error of the last century, however. Approval of any standard or form of instruction need not, and should not, freeze the language or solidify thought. In formulating specific instructions to a jury or the standards which control a court's findings, the particular circum-

■ We therefore conclude that the ALI test is the rule to be followed in this circuit:

"(1) A defendant is insane within the meaning of these instructions if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness [7] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct." Model Penal Code § 4.01 (Final Draft 1962).

See 1 Devitt and Blackmar, Federal Jury Practice and Instructions, § 13.15, p. 294 (1970).

■ For the reasons discussed, we need not pass on the precise issues raised by the defendant. Upon reconsideration by our entire court we hold the charge combining the M'Naghten-irresistible impulse rule no longer realistic and too confining of a standard to be applied in cases where insanity is raised as a defense.[8] Under the circumstances justice requires that the defendant be retried under the rule now generally and uniformly applied by federal courts throughout the land.

■ Our present holding will be applied prospectively only. It will affect only those defendants in addition to Frazier whose convictions have not become final as of the date of this decision. It shall not operate for the benefit of those whose convictions have already become final.

Reversed and remanded for a new trial.

---

stances of the case may be not disregarded, and the issue as framed by the testimony may require changes in the choice of words. . . . There should be room for adaptation to the exigencies of particular cases and still larger room for constructive innovation and improvement. We embrace today's advances, but we abjure any formalistic approach which might foreclose variation. We should not prescribe for invariable use a form of words which may be less appropriate than another in the light of the testimony in a particular case and which might tend to live on long after more rational solutions have been uncovered.

"In short, while our approval of the American Law Institute's formulation is unequivocal and unreserved, we proscribe no other form of words which may appear more appropriate in a given case now or in cases generally in the future."

7. In the first part of the original ALI charge the word "criminality" was used. Since that time four circuits have adopted the alternate suggested word "wrongfulness." United States v. Freeman, supra, 357 F.2d at 622; Blake v. United States, supra, 407 F.2d at 915–916; United States v. Shapiro, supra, 383 F.2d at 686; Wade v. United States, supra, 426 F.2d at 71–72. We adopt this modification.

8. It is unfortunate a reversal is necessitated by the district court's use of instructions which have been reviewed and recently approved by our court. However, the rule governing the defense of insanity is one of decision and subject to change. The law serves a greater need in rejecting erroneous tradition than in giving repose to a continuing injustice.