**UNITED STATES of America, Appellee,**

v.

**Tyrone Lewis THOMAS, Appellant.**

**No. 75–1946.**

United States Court of Appeals, Eighth Circuit.

Submitted May 10, 1976.

Decided June 21, 1976.

Thomas B. Hayes, Jr., St. Louis, Mo., for appellant.

Thomas E. Loraine, Asst. U. S. Atty., St. Louis, Mo., Donald J. Stohr (former U. S. Atty., St. Louis, Mo.) on brief, for appellee.

Before VOGEL, Senior Circuit Judge, HEANEY and HENLEY, Circuit Judges.

VOGEL, Senior Circuit Judge.

Appellant Tyrone Lewis Thomas was charged by indictment with transportation

in interstate commerce of a stolen motor vehicle in violation of 18 U.S.C. § 2312 (Count 1), and with knowingly transporting in interstate commerce one James C. Waibel, who had been kidnapped and held for ransom, all in violation of 18 U.S.C. § 1201 (Count 2). Appellant was tried by a jury and found guilty on both counts. He was sentenced on December 1, 1975, to concurrent sentences of five years' imprisonment on Count 1 and 25 years' imprisonment on Count 2. Appointed counsel in the District Court also represented the appellant on the appeal here.

Two main issues are submitted for consideration:

(1) Whether the trial court erred in denying appellant's motion for a verdict of acquittal at the close of all of the evidence for the reason that, as a matter of law, the government did not sustain its burden of proving that appellant was beyond a reasonable doubt sane at the time of the commission of the alleged offense.

(2) Whether the trial court erred in refusing appellant's alternative Instruction No. 24 on the defense of insanity and in giving the government's Instruction No. 24 on this issue. We affirm on both points.

*Statement of Facts*

The alleged crimes herein were committed on March 29, 1974. At that time appellant appeared at the Lindburg Cadillac Company in St. Louis, Missouri, and, under the guise of wishing to go for a test drive in a Cadillac car, convinced James Waibel, a Cadillac salesman, that he had just received an inheritance of $6,000 and a car for a trade-in to apply on the purchase price of a Cadillac. The plan was to force the Cadillac dealer to pay a ransom for the salesman's release. With the point of a knife at his throat, the victim was forced to go in the demonstrator to East St. Louis, Illinois, where he was placed in the car's trunk and driven around for many hours before being left in the trunk when the demonstrator Cadillac was parked in a garage in East St. Louis, Illinois. At one time appellant told Waibel, "We're going to see how much you're worth to Lindburg Cadillac." The victim was in the trunk compartment from 2:30 P.M. until approximately 4:30 A.M. At one time during that period the appellant opened the trunk about three inches and told Waibel that the arrangements had been made, and to "sit tight". After the car had been stopped a period of about 45 minutes, the victim finally escaped from the trunk by hitting the locking mechanism with the jack assembly. He found the automobile had been placed in a garage with the trunk end of the automobile to the closed end of the garage. Appellant was subsequently indicted on November 11, 1974.

On February 21, 1975, in response to appellant's motion, the District Court ordered a psychiatric examination of appellant by Dr. Joseph Shuman, a psychiatrist in private practice in north St. Louis County. Based upon this examination, Dr. Shuman concluded that Thomas was suffering from paranoid schizophrenia on that date and in all probability on March 29, 1974, the date of the commission of the crime. The District Court then ordered appellant to be committed to the United States Medical Center in Springfield, Missouri, to determine his competency to stand trial. Appellant entered the federal Medical Center on March 24, 1975. In a competency hearing held July 22, 1975, the District Court found the appellant mentally incompetent to stand trial at that time but ordered him again committed to the federal Medical Center, for a period not to exceed six months or until appellant was found mentally competent to stand trial or the charges against him dismissed if he were not.

In October 1975, a second competency hearing was held, at which time a contrary conclusion was arrived at and appellant was then found competent to stand trial.

During appellant's commitment to the Medical Center before his first competency hearing, he was seen and interviewed by several staff psychiatrists. During this first admission, Dr. Peter Dwyer, Dr. Daniel Taub and Dr. Harold Fain, Chief of Forensic Psychiatry at the Medical Center,

all examined appellant and concluded that he was not competent to stand trial and was probably not mentally competent at the time of the commission of the alleged crime. However, when appellant was returned to the Medical Center, having been found incompetent at the July hearing, the staff doctors noted a significant change in his demeanor. Appellant's behavior seemed to display no signs of psychosis. Consequently, Dr. Taub and Dr. Fain reversed their opinion as to appellant's sanity, concluding both that appellant was then presently competent to stand trial and that appellant was not insane at the time of the commission of the crime. Dr. Dwyer concurred in the conclusion that appellant was competent to stand trial but retained his opinion that appellant had been suffering from paranoid schizophrenia during his first commitment to the Center.

■ Appellant now asserts that the trial court erred in failing to direct a verdict for appellant, alleging that the government's evidence failed to establish sanity at the time of the commission of the alleged offense beyond a reasonable doubt. After an examination of the transcript and a review of the testimony, we find overwhelming evidence to support the jury verdict. Dr. Shuman (who interviewed appellant but once), appellant's chief expert witness, testified unequivocally that he took Thomas' statements as true for the purpose of his diagnosis. Dr. Shuman's evaluation of appellant thus depended upon appellant's credibility, the evaluation of which was properly submitted to the jury. Appellant's second expert witness, Dr. Dwyer, although testifying that he observed a paranoid schizophrenic reaction in Thomas, nonetheless stated he had no opinion as to appellant's sanity at the time of the offense. Both Dr. Taub and Dr. Fain testified at trial that on March 29, 1974, appellant was not suffering from mental illness. Both observed a revealing and sudden improvement in appellant's behavior after the first competency hearing. After the hearing, appellant also for the first time allowed complete psychological testing to be performed, thus enabling Dr. Fain and Dr.

Taub to evaluate his sanity on a basis other than appellant's self-serving personal history. These tests revealed, in the opinions of Dr. Taub and Dr. Fain, no evidence of psychosis—in fact, a "remission" of schizophrenia sufficiently prompt to lead Dr. Fain to conclude that appellant had simply succeeded in fooling the psychiatrists at the outset.

Finally, Lois Briggs, a consultant psychologist at the Medical Center who met regularly with appellant until his discharge in September 1975, described him as alert, perceptive and without any abnormalities in his behavior. Ms. Briggs testified that in a conversation with appellant on September 16, 1975, he revealed to her that he had a "little act" that he used to convince people that he was crazy. Appellant thereupon voluntarily displayed for Ms. Briggs a number of schizophrenic symptoms.

Ms. Briggs testified as follows in regard to the September 16th conversation with appellant:

A  He said, "This might—this might come back on me in court," that "I have let you know more about what I'm really like and I haven't acted crazy," and he said, but—I said, "That's right, it might." And he said, "Well, that doesn't matter because I've got Dr. Shuman on my side, and it will be you against him," and I said, "That's okay." And I said, "How did you manage to convince people that you were crazy in the first place? I don't see how you could do it." He said, "Well, I have a little act that I use. You want to see it?"

I said, "Sure."

So, then, he went very voluntarily into an act which lasted several minutes in which he displayed a number of schizophrenic symptoms, and then he stopped it and then we both had a laugh about it.

Q  Now, did he say—

A  And the other inmates sitting there were laughing also.

This was certainly corroborative of the suspicious circumstances of recovery observed by the psychiatrists.

The government also adduced other lay testimony supportive of appellant's sanity. James Waibel, the victim, testified that appellant was alert, coherent and responsive in his actions on the day of the commission of the crime. The jury could also infer from the very organization of appellant's actions on the day of the crime that he was behaving in a rational and coherent manner. Appellant's former parole officer testified that appellant seemed normal in all contacts the two had in late 1973, not long before the commission of this crime. The FBI agent who interviewed appellant about the kidnapping in October 1974 also related that appellant was composed, responsive and alert.

The government conceded that the appellant produced sufficient evidence to meet his initial burden of overcoming a presumption of sanity. *See Dusky v. United States,* 295 F.2d 743, 754 (8th Cir. 1961), *cert. denied,* 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962). The government then had the duty to establish that the appellant was sane at the time of the commission of the act and such burden had to be carried beyond a reasonable doubt. *Id.* This burden was clearly met. The government's burden can also be met with observations by lay witnesses. *Kaufman v. United States,* 350 F.2d 408, 413 (8th Cir. 1965), *cert. denied,* 383 U.S. 951, 86 S.Ct. 1216, 16 L.Ed.2d 212 (1966); *Dusky v. United States, supra,* at 754. We conclude without hesitation that the government produced sufficient expert and lay testimony to allow the jury to find, as it did find, that the government established sanity beyond a reasonable doubt.

As to the second issue raised by the appellant, the government's instruction on insanity as a defense contained the phrase "as used in these instructions, the terms 'mental disease or defect' do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct." Appellant's proposed instruction omitted this statement. We find the trial court's instruction to be without error. Even if it could have been worded differently, we find complete justification in the record for its usage here and find no prejudice to the appellant. The instruction was specifically approved by this court in *United States v. Frazier,* 458 F.2d 911, 918 (8th Cir. 1972). Furthermore, the record here is replete with references to anti-social behavior and past criminal conduct of the appellant; e. g., drug usage beginning at the age of thirteen, federal parole, stolen automobiles, military A.W.O.L., and threats to other persons. We find no merit in appellant's argument that giving the instruction approved in *United States v. Frazier, supra,* based primarily upon evidence introduced at the appellant's own initiative, violated his Fifth Amendment rights. Appellant was fairly tried and fairly convicted.

This case is in all things affirmed.