UNITED STATES of America, Plaintiff,

v.

Ronald Allan RIMERMAN, Defendant.

No. CR. 79–0–72.

United States District Court,
D. Nebraska.

Jan. 7, 1980.

Edward G. Warin, U. S. Atty., Omaha, Neb., for plaintiff.

J. Joseph McQuillan, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

The defendant, Ronald Allan Rimerman, is charged under a two-count indictment with committing air piracy in violation of 49 U.S.C. § 1472(i), and with interfering with a flight crew member in violation of 49 U.S.C. § 1472(j). These alleged violations occurred on July 20, 1979, while the defendant was enroute on a flight from Denver, Colorado, to Omaha, Nebraska, within the special aircraft jurisdiction of the United States.[1] Basing his finding on the reports of two psychiatrists, the United States Magistrate, on September 4, 1979, found the defendant was competent to stand trial and to participate in his own defense. The defendant filed a notice of his intention to rely upon the defense of insanity pursuant to Federal Rule of Criminal Procedure 12.2(a), waived a jury trial, and entered into a stipulation with the government that trial be to the Court and that a compilation of investigative reports prepared by the Federal Bureau of Investigation serve as the factual basis for purposes of the trial. On November 19, 1979, trial was had to this Court. No live testimony was presented and the case was submitted to the Court on the basis of the compiled F.B.I. reports, the reports of three psychiatrists and a clinical psychologist, and the records obtained from the Department of Psychiatry, Health Sciences Center, University of Oregon, concerning the defendant's history of prior treatment for mental illness.

The facts surrounding the hijacking are not in dispute and are these. On July 20, 1979, shortly after takeoff from Denver, Colorado, the defendant left his seat in the first class section of the plane, walked forward and knocked on the cockpit door. Jack Earl Rayner, Second Officer and Flight Engineer aboard the aircraft, stated that he opened the door and the defendant told him that "I have or I've got plastic explosives in my pocket, and I want to go to Cuba." The defendant took a seat in the cockpit area and remained there throughout the flight. In conversations with the crew, the defendant agreed to allow the aircraft to land in Omaha, the passengers and flight attendants to deplane, and the aircraft to be refueled. Upon arrival in Omaha, the passengers and flight attendants were allowed to deplane and shortly thereafter agents of the F.BI. entered the cockpit area of the aircraft and placed the defendant under arrest. The defendant was searched and no explosives were found.

The defendant does not deny his involvement in the above events and, in effect, concedes that factually he did what the indictment charges, i. e., he hijacked or attempted to hijack the aircraft in question and, in so doing, interfered with a flight crew member's ability to perform his duties. The only issue remaining for the Court to resolve is whether the defendant was sane on the date in question. The test for determining criminal responsibility is that proposed by the American Law Institute (ALI), as specifically adopted in this Circuit in 1972 in *United States v. Frazier,* 458 F.2d 911 (8th Cir. 1972). Pursuant to *Frazier,* a defendant is insane "if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.* at 918. A criminal defendant is presumed sane, but once evidence of insanity is introduced, the presumption is dispelled and the burden is upon the prosecution to prove sanity beyond a reasonable doubt. *United States v. Dresser,* 542 F.2d 737, 742 (8th Cir. 1976).

1. 49 U.S.C. § 1301(38), as amended, provides that:

> The term "special aircraft jurisdiction of the United States" includes—
> (a) civil aircraft of the United States;
>     *    *    *    *    *    *
> while that aircraft is in flight, which is from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the aircraft and for the persons and property aboard.

On the government's motion for a judicial determination of the mental competency of the defendant, the defendant was committed to the St. Joseph Center for Mental Health, Omaha, Nebraska, on July 23, 1979, where he was examined by Dr. Emmet M. Kenney, a board certified psychiatrist. Dr. Kenney concluded that the defendant did have a serious mental illness but that he was competent to stand trial and to participate in his own defense. In response to a subsequent request by the defendant's counsel for an evaluation of the defendant's mental condition on the date of the alleged crime, Dr. Kenney stated that in his opinion the defendant was sane within the meaning of the ALI test. In making his evaluation, however, Dr. Kenney did not have an opportunity to review the history of the defendant's prior treatment for mental illness.

Upon receipt of Doctor Kenney's opinion, the counsel for the defendant on August 16, 1979, requested that Dr. Stan L. Moore, a board certified psychiatrist in Omaha, be employed for the dual purpose of inquiring into the defendant's present mental competency as well as his mental condition on the date of the alleged crime. Dr. Moore had at his disposal the defendant's history of prior treatment for mental illness and also ordered a complete psychological workup to be performed on the defendant by a clinical psychologist, Dr. Fred D. Strider, whose report forms part of the basis for Dr. Moore's opinion. Dr. Moore found that the defendant was competent to stand trial but concluded that as a result of a mental illness, diagnosed by Dr. Moore as chronic undifferentiated schizophrenia, the defendant lacked substantial capacity to appreciate the wrongfulness of his act and was, therefore, insane within the meaning of the ALI test.

Following Dr. Moore's report, the government requested that a third psychiatrist, Dr. Edward T. Beitenman of Omaha, evaluate the defendant solely for the purpose of determining the defendant's sanity at the time of the alleged crime. Dr. Beitenman, also a board certified psychiatrist, examined the defendant on October 9, 1979. Based on that examination and a review of the defendant's history of prior treatment for mental illness, Dr. Beitenman concluded that at the time of the hijacking the defendant suffered from a mental disease, namely, schizophrenic reaction, and could not appreciate the criminality of his conduct or conform his conduct to the requirements of the law. It follows from Dr. Beitenman's report, therefore, that at the time of the alleged crime, the defendant was insane within the meaning of the ALI test.

Dr. Moore's report, Dr. Beitenman's report, and a statement from Dr. Nicholas Gerber, the defendant's immediate supervisor at his most recent place of employment, the University of Oregon Health Sciences Center, reveal the following concerning the events preceding the hijacking of the plane and the defendant's prior treatment for mental illness. The defendant apparently had many problems even in his early life, but did obtain a Ph.D. degree in chemistry, married, had two children, and worked as a researcher for Oregon State University. While working at Oregon State University, the defendant was divorced and experienced what he termed a complete mental breakdown. The defendant was terminated from his position with Oregon State University, and drifted about Oregon for approximately eighteen months before being hospitalized for treatment of mental illness at Dammasch State Hospital, Wilsonville, Oregon, where he was a patient from April 30, 1978, through October 2, 1978. The defendant was diagnosed as schizophrenic, schizo-affective type, depressed. Once discharged, he was given medication for the treatment of psychosis on an out-patient basis.

In December of 1978, the defendant was hired as a researcher for the University of Oregon Health Sciences Center. A number of problems ensued and, about a month prior to the hijacking, the defendant no longer appeared for work. The defendant's immediate supervisor, Dr. Nicholas Gerber, visited the defendant daily, often finding him lying on a mattress on the floor of his

apartment staring at the ceiling. As the defendant became progressively more unstable and depressed, he was encouraged by Dr. Gerber to seek treatment, but refused. Eventually, the defendant's parents in Omaha, Nebraska, were contacted and it was agreed that an extended visit with his parents in Omaha might prove beneficial. Arrangements for a flight to Omaha were made, but prior thereto, on July 13, 1979, the defendant attempted to rob a grocery store and then allowed himself to be apprehended. He stated that he attempted to rob the store because "I was getting back from capitalism what capitalism takes away from the people." By this time, the defendant had become convinced that communism was the only form of government which could alleviate the suffering in the world. The defendant was committed to the Crisis Unit of the University of Oregon Health Sciences Center Hospital. The defendant stated that he had ceased taking his medication the last two to three weeks, and it was thought that his psychotic symptoms had recurred as a result. The defendant responded to treatment and appeared to have a good prognosis if medication was continued and support from his family was sought. Arrangements were again made for a flight to Omaha, and on July 20, 1979, the defendant was released from the hospital and accompanied to the airport by Dr. Gerber, who had made the necessary reservations and other arrangements for the flight.

In interviews with Drs. Moore and Beitenman, the defendant stated that he had never contemplated hijacking an airplane and that at the time of the hijacking he was very confused, tormented by voices and visions inside his head, and felt compelled to do something about the terrible condition of humanity. Since he felt the answer to the world's problems was communism, the defendant related that he hoped to go to Cuba where he would be able to learn more about communism and would then be able to share these answers with others in the United States. The defendant stated that "[s]aving the world was more important to me than the airplane going its own way or what happened to me."

Based upon the circumstances surrounding the hijacking of the plane, the defendant's history of prior treatment for mental illness, the reports of Drs. Moore and Beitenman, and the detailed statement given by the defendant's most recent employer, Dr. Gerber, this Court finds that at least a reasonable doubt exists as to the defendant's sanity at the time of the hijacking. In terms of the ALI test, the evidence before this Court creates a reasonable doubt as to whether at the time of the alleged conduct, as a result of mental disease or defect, the defendant possessed substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. In so finding, the Court has not ignored the opinion of Dr. Kenney that the defendant was sane, but has taken into consideration the fact that Dr. Kenney did not have the benefit of the psychological tests made available to Dr. Moore, nor an opportunity to review the records concerning the defendant's prior hospitalizations and treatment which were available to both Drs. Moore and Beitenman. It should also be noted that the government, with commendable candor, has acknowledged that it could not in good conscience argue that the defendant was sane beyond a reasonable doubt on the date in question.

Accordingly, it is hereby adjudged that the defendant is not guilty by reason of insanity of committing air piracy in violation of 49 U.S.C. § 1472(i), or of interfering with a flight crew member in violation of 49 U.S.C. § 1472(j). The United States Attorney is directed to promptly refer this matter to the Douglas County Mental Health Board for further proceedings to the end that the defendant may not remain in a position in which he may be a danger to himself or to others.[2] A separate order will be entered this date in conformity herewith.

---

2. Under 18 U.S.C. §§ 4244 and 4246, a defendant who is found incompetent to stand trial

may be committed to the custody of the United States Attorney General, but no similar provi-

sions exist for the civil commitment by a federal court of a defendant who has been tried and found not guilty by reason of insanity. As noted by the Court in *United States v. Alvarez*, 519 F.2d 1036, 1048 (3rd Cir. 1975), this obvious gap in the federal law has received the attention of the Judicial Conference and the Department of Justice over a long period, but Congress has not responded. Since this Court is without the authority to order the commitment of a defendant found not guilty by reason of insanity, it has no choice other than to release such a defendant with the hope that state authorities will commence any necessary civil commitment proceedings. Presently, the responsibility for the involuntary detention of the insane for treatment and the protection of society in this regard rests solely with the states.