UNITED STATES of America, Appellee,

v.

**Ron MORRISON, Appellant.**

**Nos. 92–3232, 94–3146 and 95–3041.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 20, 1996.

Decided Oct. 22, 1996.

Rehearing Denied Dec. 17, 1996.

Ron Morrison, appearing pro se, was on the briefs for appellant.

Mark J. Rochon, Washington, DC, argued the cause and filed the briefs for appellant.

E. Vaughn Dunnigan, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Roy W. McLeese, III, and Geoffrey G. Bestor, Assistant United States Attorneys, were on the brief. Elizabeth Trosman entered an appearance.

Before: EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

On July 7, 1992, a jury found Ron Morrison guilty of conspiracy to distribute and to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846, two separate instances of possessing crack cocaine with intent to distribute it in violation of 21 U.S.C. § 841, and using and carrying deadly weapons during and in relation to these drug offenses in violation of 18 U.S.C. § 924(c). The jury also found Morrison guilty on two counts of conspiring, and attempting, to prevent potential witnesses from testifying truthfully in his trial, in violation of 18 U.S.C. § 1512(b). Morrison filed a motion to vacate his sentence under 28 U.S.C. § 2255 on the ground of ineffective assistance of counsel on February 4, 1994, which the district judge who presided over his trial

denied on August 29, 1994. This court consolidated Morrison's appeal of the denial of his § 2255 motion and his direct appeal of his convictions.

Morrison asserts that the district court erred in denying his § 2255 motion, and abused its discretion by ruling on the motion without first conducting an evidentiary hearing. Morrison also argues that the district court improperly limited cross-examination of a government witness, that his convictions under § 924(c) should be vacated in light of the Supreme Court's recent decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), and that there was insufficient evidence to support one of his convictions under § 1512(b).

We find merit only in the claim based on *Bailey,* and thus we affirm the district court's summary denial of Morrison's § 2255 motion, as well as all of Morrison's convictions except his convictions under § 924(c), which we reverse. We remand the case for resentencing in light of this reversal. We find that the decision of his trial counsel on which Morrison bases his claim of ineffective assistance was a reasonable strategic choice, and the record does not indicate that it resulted in prejudice to his trial. The court's limitations of the cross-examination of key government witness Paulette Glenn were not abuses of discretion, because they were imposed to prevent witnesses from giving speculative answers and to prevent the introduction of evidence with no probative value on issues in the case. Finally, the jury was presented with sufficient evidence to support its conclusion that Morrison attempted to "corruptly persuade" Doris Holmes to give specific false testimony in an official proceeding, in violation of 18 U.S.C. § 1512(b).

### I. BACKGROUND

On November 8, 1991, police executed a search warrant at a house rented by Paulette Glenn in Southeast Washington, D.C. In the living room, police found a jacket belonging to Ron Morrison with $113 cash in the pocket, Morrison's loaded .38 caliber pistol underneath a sofa, and over thirty plastic bags containing a total of 5.467 grams of crack

cocaine. Morrison was in New York at the time of this first search. On November 16, 1991, police executed a second search warrant at this same house. As they entered, they saw Morrison run from the living room, where he had been packaging crack in plastic bags, toward the back door. An associate of Morrison's inside the kitchen had been guarding the back door with a sawed-off shotgun. Police found the loaded shotgun, ammunition, and drug paraphernalia in the kitchen.

Morrison evaded the police and fled to North Carolina. While in North Carolina he asked Doris Holmes, with whose son he was acquainted, to tell anyone who asked that Morrison had been living with her for a year, and that she took care of Morrison's children. Holmes refused.

Morrison returned to the District of Columbia and was arrested and jailed in March of 1992. Soon after his return, Morrison's girlfriend Audrey Wilson visited Glenn and told her that Morrison wanted to see her. On a second visit, Wilson told her that Morrison wanted Glenn to sign an affidavit stating that he had been in the dining room, rather than the living room, when the police conducted their second search. Some days later three associates of Morrison's entered Glenn's home at five o'clock in the morning and told her that Morrison had asked them to bring her to New York. Glenn said she couldn't go with them because her mother was ill, and they left. Later Wilson visited Glenn yet again, asked her whether she would sign an affidavit that Morrison's lawyer would bring to her, and offered her some furniture if she signed the affidavit.

Glenn met with the prosecutor in charge of Morrison's criminal case and told him of her conversations with Wilson and with Morrison's associates. The prosecutor asked Glenn to visit Morrison in jail wearing a recording device, to collect evidence regarding attempts by Morrison to tamper with potential witnesses against him. The prosecutor specifically instructed her not to ask Morrison about the drug and weapon violations with which Morrison had already been charged. When Glenn arrived at the jail she found Wilson visiting Morrison. Wilson left as Glenn entered, and Morrison and Glenn had a brief conversation which the police recorded. Later, with Glenn's assistance, a police secretary prepared a transcript of the tape.

## II. Discussion

### A. *Ineffective Assistance of Counsel*

On February 4, 1994, Morrison filed a *pro se* motion under 28 U.S.C. § 2255 with the district judge who presided over his trial, arguing that he had been denied the effective assistance of counsel guaranteed by the Sixth Amendment because his lawyer had failed to seek suppression of the taped conversation between himself and Paulette Glenn at trial, and because this failure constituted such a severe breach of the normal standards of competence required of defense counsel, and was so prejudicial to the presentation of his defense, that it required the court to vacate his conviction. The government filed an opposition, to which it attached a declaration by Morrison's trial counsel in which she explained that she had not objected to the admission of the taped conversation because it was "on its face, purely exculpatory and consistent with Mr. Morrison's theory of the case which was plain denial of the charges," and because the arguments that the government intended to use to cast the conversation in an incriminating light were "not ... particularly persuasive" and "did not outweigh the exculpatory use" that she intended to make of the taped conversation. Appellee Appendix ("App.") at 53–55. She added that Morrison himself had not wanted her to object to the admission of the tape recording, because he agreed that it was exculpatory and that it would give him the benefit of having the jury hear his claims of innocence without the risk involved in testifying at trial and subjecting himself to cross-examination. *Id.* at 53–54. Morrison then filed a reply to the government's opposition, in which he contradicted his counsel's argument that the taped conversation was exculpatory, and claimed that he couldn't recall having had any conversation with her regarding the admission or exclusion of the conversation. District Court Case No. CR91–693–02 document 134, page 9, footnote 2.

On August 24, 1994, the district judge denied the motion, holding that "[r]eview of the informant's statement in evidence, the closing arguments of both counsel in response to it, and defense counsel's affidavit reconfirm that defense counsel made a 'reasonable strategic or tactical judgment,'" because "the taped statement was arguably exculpatory, and furnished the defendant with favorable testimony which could not have been otherwise available to him unless he had waived his Fifth Amendment privilege." App. at 63. Morrison now appeals the district court's denial in this court.

Morrison's claim of ineffective assistance is based on his assertions that the conversation would have been excluded had an objection been made, the taped conversation actually was incriminating, and the government's significant use of it in closing argument severely prejudiced the outcome of the trial. The government acknowledges the first point, that the conversation would have been suppressed had a timely objection been made at trial, because Glenn was acting as a government agent when she visited the defendant in jail, and Morrison made the taped statements about crimes for which he had already been indicted without having counsel present, in violation of his rights under the Sixth Amendment. *See* Brief for Appellee at 20. We disagree, however, with Morrison's second and third claims—that the conversation was so clearly incriminating that his lawyer's failure to object exhibited gross incompetence, and that the government's use of the taped conversation at trial severely eroded the trial's fairness.

To demonstrate that his counsel was constitutionally ineffective, Morrison must show both that she "made errors so serious that [she] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that there is a reasonable probability that, but for these errors, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The *Strickland* Court noted that "[t]here are countless ways to provide effective assistance in any given case," and that "strategic choices made after thorough investigation of

law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 689–90, 104 S.Ct. at 2065–66.

### 1. *Incompetence*

We conclude, as did the trial judge, that the taped conversation between Morrison and Glenn was susceptible to two contradictory interpretations, one exculpatory and the other incriminating, and that the incriminating interpretation was not so unmistakably the more natural one that Morrison's lawyer's decision to let the conversation be admitted in evidence without objection was clearly incompetent. This is not to say that the other choice—objecting to its admission—would not also have been a competent one, perhaps in hindsight the better one. Yet this fact alone does not indicate that the choice Morrison's lawyer made fell below the standard of competence demanded of a defense lawyer.

On their face, Morrison's statements on the tape were undeniably exculpatory. Morrison spent the better part of the ten-to-fifteen-minute conversation asserting that somebody had tried to frame him, that he couldn't understand why he was being prosecuted when the drugs had been found in Glenn's house and she had received probation, that he had never sold or possessed cocaine, and that he had never lived at her house and was merely visiting when the police saw him fleeing from there. At oral argument Morrison's counsel (not the same one who represented him at trial) claimed that Morrison's taped statements added nothing to the general denial already contained in his Not Guilty plea, and did not tend to support the specific theory of Morrison's trial defense—that Glenn had lied to the police about Morrison's involvement in order to obtain a reduction in her own punishment—and thus no competent counsel could have perceived any strategic advantage in the admission of the taped conversation. The transcript of the conversation, however, belies the certainty of any such assertion. Morrison's recorded statements conveyed his singularly strong conviction that *someone*

had lied about him in order to shift the focus of the prosecution onto him,[1] and he definitely articulated the theory of his defense by hinting that he couldn't understand why Glenn had received only probation when the drugs were found in her house.[2] Together, these statements could have done much to help the jury believe that Glenn had played the dishonest and traitorous role in which Morrison's defense theory attempted to cast her. In her closing argument, Morrison's trial counsel argued that his statements, which he made without any awareness they were being recorded, should be taken at face value—as proof that he wasn't selling drugs, and that the drugs found in Glenn's house were not his.[3] Her interpretation, grounded in the literal meaning of the statements on the tape, had the potential to persuade the jury, and in our view were supportive of Morrison's overall defense strategy.

The government's incriminating "spin" on the same taped conversation theorized that the circumstances of the conversation, and the manner in which Morrison spoke, were strong evidence of Morrison's consciousness of his own guilt. The government argued that the totality of the conversation suggested that Morrison's girlfriend Audrey Wilson, who had been visiting with him immediately prior to the conversation, had warned him that Glenn would be wearing a recording device when she came to see him.[4] Morrison's manner of speaking, the government claimed, showed his guilt because he immediately and spontaneously "launched" into a "long spill" about how someone had lied about him without having been asked about this subject by Glenn. Furthermore, the government pointed out that Morrison even denied that his name was "Mike," a nickname that numerous witnesses had identified him with, thus underscoring the doubtful nature of all of his protestations on the tape. Tr. 7/2/92 at 107. In sum, the government told the jury "when you listen to that tape ... you are hearing the protestations of a guilty person who knows that somebody is listening in to what he is saying." *Id.*

The government's incriminating interpretation of the conversation was not inherently more plausible than defense counsel's exculpatory interpretation, indeed it required a somewhat complex explanation and set of inferences to make it work in the government's favor. Thus Morrison's lawyer's decision to let the conversation go in, and then argue the exculpatory interpretation to the jury, was by no means an unreasonable strategic decision. The exculpatory interpretation was consistent with the literal meaning of Morrison's statements and required far fewer inferences than did the government's incriminating interpretation. The government's interpretation required the jury to infer from the fact that Audrey Wilson had visited Morrison before the conversation, and from the manner in which Morrison spoke, that Morrison's statements asserting his innocence actually proved the opposite. Admittedly, the government's interpretation gained plausibility from the extreme nature of certain of Morrison's denials and, according to the government, the pronounced hesitation and stuttering which characterized Morrison's pattern of speech.[5] At the same time, Morrison's tone of voice and manner of speaking could not lend much force to either interpretation, because both parties admitted at trial that the conversation was barely au-

1. *See* App. at 58–59 ("someone is lying on me ... someone is trying to underminin' me, someone is trying framing me, someone is talking some lies ... they're lying and that's it.... I don't know who is blackmailing me.... I have to find out why they're lying on me, why they're trying to frame me, understand?").

2. App. at 58 ("I saw someone is lying on me because if, if, if, if the police find drugs in your house, I, I, I, I, I, I, I and give you probation all right what the f— they holding for....").

3. Tr. 7/2/92 at 124 ("Well, you heard the tape. I ask you to listen to it again and read the transcript. What happened is that Mr. Morrison said I wasn't selling drugs. Those weren't my drugs.").

4. Tr. 7/2/92 at 107 ("I suggest to you that what this tape tells you is that Ron Morrison knew what Paulette Glen [sic] had in her ear.").

5. *See* App. at 60 ("I never sold drugs, I don't know anything about any drugs. I, I, I, my knowledge of drugs is what I see on T.V., that's my knowledge....").

dible on the tape.[6] On balance, the exculpatory interpretation of the conversation was not significantly less plausible than the inculpatory interpretation, and therefore the decision to permit the tape to be introduced at Morrison's trial was not so unreasonable strategically as to satisfy the first component of the *Strickland* test.

### 2. *Prejudice*

■ But even if the decision to allow the conversation into evidence had been sufficient evidence of incompetence, Morrison has not made a compelling showing that its introduction severely undermined his defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Morrison's appellate counsel asserts that the government used the conversation to "ma[k]e mincemeat" of Morrison, and then quotes from the government's reference to the conversation in its closing argument in support of this assertion. Brief for Appellant at 22. But the simple fact that the government used evidence in its closing argument does not prove that the jury found the evidence compelling or determinative. At trial, each side used the evidence for whatever it was worth in supporting its case, and each side pressed its own interpretation before the jury in closing argument. We cannot, of course, ever be entirely certain to what degree, if at all, a jury found particular evidence probative of either guilt or innocence, but in this case it seems to us at most a toss-up.

Furthermore, whatever secondary negative inferences the jury might have drawn from the taped conversation, they definitely were eclipsed by a great deal of direct evidence supporting Morrison's convictions, including the testimony of Paulette Glenn, Morrison's weapons, drugs, ammunition, and clothing that police found in the living room of the house Glenn rented, the fact that police saw Morrison fleeing from the living room when they conducted their second raid,

and tally sheets, large quantities of cash, crack cocaine and tools used for weighing and packaging the drug for sale that police found in the house during the second raid. Because of the plethora of other more cogent evidence supporting Morrison's convictions, and because it is not at all apparent whether the evidence on which Morrison bases his ineffective assistance claim worked against him or in his favor, we are unable to conclude that the admission of this evidence prejudiced his defense.

### 3. *Denial of the § 2255 Motion Without a Hearing*

Morrison also argues before this court that the district judge who denied his § 2255 motion abused his discretion by failing to first hold an evidentiary hearing on the motion.

■ A judge need not conduct an evidentiary hearing before denying a petition for relief under § 2255 when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 (1994). The rules governing § 2255 proceedings in district courts provide that "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal...." Rules Governing § 2255 Proceedings, Rule 4, 28 U.S.C. foll. § 2255 (1994). Our cases have stressed that a district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to have been prejudiced. *See, e.g., United States v. Sayan,* 968 F.2d 55, 66 (D.C.Cir.1992) (citing *Blackledge v. Allison,* 431 U.S. 63, 74 n. 4, 97 S.Ct. 1621, 1629 n. 4, 52 L.Ed.2d 136 (1977)); *United States v. Pollard,* 959 F.2d 1011, 1030–31 (D.C.Cir.), *cert. denied,* 506 U.S. 915,

---

6. Tr. 7/1/92 at 150 ("My client and I listened repeatedly to the tape. You can't understand it."); Tr. 7/2/92 at 107 ("The sound is probably not that great and Mr. Morrison speaks so quickly.").

113 S.Ct. 322, 121 L.Ed.2d 242 (1992).[7] We have also held that a summary denial of a § 2255 motion is appropriate when the ineffective assistance claim is speculative (*see United States v. Vecchiarello,* 536 F.2d 420, 425 (D.C.Cir.1976) ("The allegations [of judicial bias] fall short of requiring a hearing. The progressive steps from 'opportunity' to 'inclination' to prejudicial discussion are purely speculative, and the recorded *actions* of the trial judge are so free from error or bias that success on this claim, even if it had been fairly alleged, appears extremely unlikely."); *United States v. Parman,* 461 F.2d 1203, 1205 (D.C.Cir.1971) ("As to appellant's charges of a lack of proper investigation by defense counsel, while a hearing is indicated when a 2255 motion is grounded upon a plausible claim of attorney misconduct, such as wrongful inducement of a guilty plea, a court cannot engage in vague speculations about the kind of 'investigation' defense counsel might have made in addition to the prodigious efforts established by the record" (citation omitted))), or when the claim does not necessitate the consideration of any information not within the record or within the memory of the judge ruling on the motion (*see Pollard,* 959 F.2d at 1031 (citing *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962))).

▮ We believe that Morrison's ineffective assistance claim did not give rise to the need for an evidentiary hearing because the court could only speculate as to whether the decision to allow the government to introduce the taped conversation prejudiced the defense, and because we do not see how a decision on Morrison's motion would have benefited from the consideration of any information outside of the record and the judge's memory of the trial. In ruling on the motion, the district judge stated clearly that he had not taken Morrison's lawyer's affidavit at face value, but had evaluated the lawyer's assertion that the taped conversation was exculpatory by looking again at the transcript of the conversation, the two parties' closing arguments, and the fact that by allowing the taped conversation to be admitted Morrison was able to present his protestations of innocence to the jury without subjecting himself to cross-examination. App. at 63. The court did not explicitly discuss Morrison's statement casting doubt on his lawyer's assertion that they had decided together to let the evidence in, but Morrison did not deny having had such a conversation; he only claimed not to remember it.[8]

Finally, even if Morrison could have shown that his lawyer's failure to object to the admission of the conversation was the product of inadvertence or ignorance, rather than a deliberate strategy choice, that would not have affected the judge's determination that the admission of the tape and transcript did not prejudice Morrison's trial. *See* Appellee Appendix at 63. Thus, the district judge was well within his discretion in deciding that Morrison's § 2255 motion, the government's opposition, and the files and records of the case, conclusively showed that Morrison was entitled to no relief, and thus that an evidentiary hearing was not a necessary precursor

---

7. In *United States v. Fennell,* we held the approximate converse of this proposition—when an appellant has *not* raised a claim of ineffective assistance of counsel before the district court, either in a motion for a new trial or in a collateral attack under § 2255, we generally *do* remand an ineffective assistance claim raised in this court to the district court for an evidentiary hearing. *United States v. Fennell,* 53 F.3d 1296, 1304 (D.C.Cir.1995) (citing *United States v. Cyrus,* 890 F.2d 1245, 1247 (D.C.Cir.1989); *United States v. DeCoster,* 487 F.2d 1197, 1201 (D.C.Cir.1973)).

8. It is unlikely that the question of whether Morrison had expressly agreed to the strategy chosen by his lawyer with regard to the taped conversation would have merited a hearing even if Morrison had unequivocally asserted that he had never agreed to this strategy. The decision whether to object to a particular item of evidence is not among those in regard to which the client's input is considered essential, as are the decisions whether to plead guilty, whether to testify, and whether to take an appeal. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983); MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.2(a) (1995). Nor must a lawyer, as a general matter, inform the client of every incidental tactical decision he or she will implement at trial. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.4 cmt. [2] (1995). So even if Morrison's lawyer did not seek Morrison's opinion before making this strategic decision, this fact could not render the decision incompetent or inappropriate.

to his denial of the motion.[9]

### B. *Limitation of Cross–Examination of Paulette Glenn*

■ The second arrow in Morrison's quiver is his claim that the district court abused its discretion in twice limiting his cross-examination of Paulette Glenn, a witness both parties agree was essential to the government's case.[10] In one instance, the judge cut short Morrison's counsel's cross-examination with regard to Glenn's possible bias in favor of the government, based on her fear of losing custody of her children. In another, he prevented Morrison's counsel from trying to impeach Glenn with a civil suit that had allegedly been filed against her.

#### 1. *Limitation of Cross–Examination Regarding Possible Bias*

In cross-examining Glenn, Morrison's counsel attempted to impeach her by showing that she was cooperating with the government under threat of a prison sentence which would mean losing custody of her children, and thus she had a strong incentive to say anything the government wanted her to. In pursuit of this objective, Morrison's counsel elicited from Glenn that her two children lived with her, and that she would lose custody of them "if [she] were locked up." Tr. 7/1/92 at 232. At this point, Morrison's counsel pressed on, precipitating the following exchange:

Q. Okay. So the only way to keep from losing your children is to testify against Mr. Morrison?

A. Could you repeat that question?

THE COURT: I am afraid I am going to have to sustain an objection to that question that has not been made. Sentencing is the responsibility of the court, and nobody knows now what is going to happen at the sentencing.

MS. NORMAN: All right, your honor, but—

THE COURT: And certainly the witness does not.

MS. NORMAN: But if she didn't cooperate—

THE COURT: I don't want to hear any more about it.

MS. NORMAN: (Continuing)—it would be a mandatory sentence.

*Id.* at 232–33.

This limitation on Glenn's cross-examination did not amount to an abuse of discretion, because the question called for a speculative answer on Glenn's part. Glenn had pled guilty to a violation of 21 U.S.C. § 856, a crime with no statutorily-mandated minimum sentence. *See* 21 U.S.C. § 856 (1994). Thus, the only floor placed on Glenn's sentencing was that created by the sentencing guidelines, and while the guidelines place significant constraints on the discretion of sentencing judges, they permit judges to depart from guideline sentences when the judges find "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission ... that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1994). Glenn could only speculate as to what would happen had she

---

**9.** The defendant argues that an earlier decision of this circuit, *United States v. Barnes*, 610 F.2d 888 (D.C.Cir.1979), supports his claim that he was entitled to a hearing on his § 2255 motion. Brief of Appellant at 42. But *Barnes* is readily distinguishable from this case.

In *Barnes*, this court held that the district court was required to conduct an evidentiary hearing before ruling on defendant's § 2255 motion, because "the present record is subject to differing interpretations [such that] we cannot determine whether counsel's failure to raise the voluntariness claim was an informed and deliberate strategic waiver." *Id.* at 892. In that case, however, it appears that the district judge denied the defendant's § 2255 motion without the benefit of responsive filings by the government or affidavits by trial counsel. In this case, the district judge reviewed the defendant's motion and the government's opposition, each of which included extensive discussion of the issues, the lawyer's affidavit, and the defendant's reply to the government's opposition, before reaching a decision that the failure to object to the admission of the taped conversation was an informed and deliberate strategy decision by the trial lawyer.

**10.** *See* Brief for Appellant at 30 ("Glenn was critical to supplying the criminal element to appellant's presence in the apartment on one of the two raids."); Brief for Appellee at 21 note 15 ("[T]he government's case hinged on the credibility of Paulette Glenn....").

refused to testify against Morrison and the government consequently declined to request a downward departure at sentencing. As the trial judge correctly observed, the sentencing judge might nevertheless have granted her a downward departure under § 3553(b), enabling her to retain custody of her children.

Furthermore, even if the premise of the judge's objection had been false, any error would certainly have been harmless in light of the cumulative nature of this portion of the cross-examination. Before the judge intervened, Morrison's counsel had already brought out the facts that Glenn was testifying pursuant to a plea agreement, that she had three children, two of whom lived with her, and that she could lose custody of her children if she went to prison. In fact, before the exchange quoted above occurred, Morrison's counsel had already asked Glenn the same question about the connection between Glenn's testimony and her ability to retain custody of her children and, after some confusion on Glenn's part, elicited the answer she sought.[11] Even in the exchange during which the judge attempted to limit the cross-examination, Morrison's counsel was able to articulate for the jury the precise point she had been trying to elicit from Glenn by saying, over the judge's interruption, "[b]ut if she didn't cooperate it would be a mandatory sentence." Therefore, because Morrison's counsel had ample opportunity to impeach Glenn on the issue of Glenn's motivation to help the government in order to avoid losing custody of her children, we hold that the district judge's error, if indeed any error had been committed, would in this instance be harmless.

### 2. Limitation of Cross–Examination Regarding Civil Lawsuit

■ Morrison also claims that the district judge abused his discretion by sustaining the government's objection to a question by defense counsel about a civil complaint that had been filed against Ms. Glenn. Morrison's lawyer first asked Glenn whether she had

ever made false accusations against anyone. After Glenn answered "[n]ot to my knowledge" counsel asked "[i]sn't it a fact that in January of 1991, Simone Davis filed a complaint against you in court in Maryland?" Tr. 7/1/92 at 232. At this point the government successfully objected to the question. When Morrison's counsel requested a sidebar conference, the judge refused on the ground that the question was "so obviously wrong." *Id.*

The Federal Rules of Evidence expressly prohibit the use of "extrinsic evidence" of a witness' conduct (except for certain types of criminal convictions) to impeach the witness, but permit "inquir[y] into" such conduct if, in the discretion of the court, the conduct is "probative of truthfulness or untruthfulness." FED.R.EVID. 608(b) (1996). In this case, the district judge evidently sustained the objection on the ground that the mere *filing* of a complaint is not "probative of truthfulness or untruthfulness," regardless of whether the allegations in the complaint, if true, would seriously undermine the witness' credibility. This ruling was in no way an abuse of discretion.

### C. Morrison's Convictions Under § 924(c)

■ The jury returned guilty verdicts on two counts of using or carrying firearms during and in relation to drug trafficking in violation of 18 U.S.C. § 924(c). The district judge's instructions to the jury on these counts stated that "[t]o find that the defendant carried or used the fire arm, the government must prove that the defendant actually or constructively possessed the fire arm. The government does not have to show that the defendant actively employed the fire arm in any manner." Tr. 7/2/92 at 168. After Morrison's trial the Supreme Court held, in *Bailey v. United States,* that the "use" of a weapon underlying a § 924(c) conviction "must connote more than mere possession" by the person committing the drug offense, and must rise to the level of "active employment." *Bailey v. United States,* —— U.S.

---

11. *See* Tr. 7/1/92 at 202:

> Q. And [testifying against Morrison] was the only way out of the two-year prison term—
>
> A. Yes.
> Q. (continuing)—is that correct?
> A. Yes.

——, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995). The government properly concedes Morrison's claim that his § 924(c) convictions must be reversed in light of the fact that the jury could have premised its guilty verdict solely on a "use" standard foreclosed by the Supreme Court in *Bailey,* and requests that this court remand the case for resentencing on the remaining convictions. Specifically, the government indicates that it will seek a two-level upward adjustment of Morrison's sentences on his other convictions for possession of a dangerous weapon in connection with a drug trafficking offense, as provided under § 2D1.1(b)(1) of the Sentencing Guidelines. *See* U.S.S.G. § 2D1.1(b)(1) (1995). In conformity with our disposition of similar requests, we reverse Morrison's convictions under § 924(c), and remand the case to the district court for resentencing. *See United States v. Fennell,* 77 F.3d 510, 510–11 (D.C.Cir.1996).

D. *Sufficiency of the Evidence Underlying the Challenged § 1512(b) Conviction*

▮ Finally, Morrison argues that the jury had insufficient evidence to convict him of violating 18 U.S.C. § 1512(b) by attempting to induce Doris Moore to present false testimony in court. Section 1512(b) provides, in pertinent part:

> Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding ... shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b) (1994).

The evidence that Morrison had attempted to "corruptly persuade" Moore with the intent to influence her testimony in an official proceeding included Moore's in-court testimony that Morrison "asked me to come down here or wherever and if anybody asks me say he had been living with me a year ... and that I babysitted his kids." Tr. 7/2/92 at 9. Moore testified that she had never seen Morrison's kids, and that Morrison had never lived with her. *Id.*

Morrison's argument on appeal is premised on this court's holding that the term "corruptly," as employed in 18 U.S.C. § 1505, a statute criminalizing the obstruction of congressional investigations, was unconstitutionally vague as applied to the defendant in that case. *United States v. Poindexter,* 951 F.2d 369, 379 (D.C.Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992). The portion of § 1505 at issue there read as follows:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede ... the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1505 (1994). The *Poindexter* court held that "as used in § 1505 ... the term 'corruptly' is too vague to provide constitutionally adequate notice that it prohibits lying to the congress." *Poindexter,* 951 F.2d at 379.

Morrison claims that under *Poindexter,* we must construe the term "corruptly persuades" in § 1512(b) so as to exclude from its coverage "a simple request to testify falsely," because the *Poindexter* court held that in order not to be unconstitutionally vague, "corruptly" would have to be construed as referring "to the manner of influencing another, not the motive for influencing another," and because § 1512(b) shares with § 1505 the characteristics that led the *Poindexter* court to hold that this "transitive" interpretation of "corruptly" was required. Brief for Appellant at 35; *see Poindexter,* 951 F.2d at 379 ("On its face, § 1505 favors the transitive reading. The other terms in the disjunctive series in which it appears are 'by threats,' '[by] force,' and 'by any threatening letter or communication,' all of which are transitive—indeed all of which take as their object a natural person. In addition, to read 'corruptly' in an intransitive sense as 'wickedly' or 'immorally' would appear to render the other methods of violating the

statute superfluous: surely the use of force to influence a congressional inquiry would always be 'wicked' or at least 'immoral.'").

While we agree that the two statutes are sufficiently similar to support a "transitive" reading of the word "corruptly" in § 1512(b), we disagree with Morrison's claim that his conduct could not still fall under the statutory ban. We note, in that regard, that the *Poindexter* court expressly approved of an interpretation of § 1505 which outlawed conduct " 'corrupting' another person by influencing him *to violate his legal duty.*" *Poindexter,* 951 F.2d at 379. Morrison tried to "corrupt" Doris Holmes by exhorting her to violate her legal duty to testify truthfully in court. Holmes understood well enough that Morrison was attempting to "corrupt" her, and she refused, in no uncertain terms, to be corrupted: "I told them I could not do that because it would be a lie and I would perjure myself." Tr. 7/2/92 at 10.

In his reply brief, Morrison retools his argument somewhat, focusing on the fact that at the time Morrison importuned Holmes, the government had not yet announced that Holmes was a potential witness against Morrison, and that Morrison hadn't specifically asked Holmes to testify for him either. Thus, there was not yet any "official proceeding" to which Morrison's inducement seems connected. Reply Brief for Appellant at 5–7. This argument does nothing to enhance Morrison's challenge of this § 1512(b) conviction. Clearly it was foreseeable by Morrison that the government would use Doris Holmes in its case against him, because Holmes had dealt with Morrison between the second police raid and Morrison's subsequent arrest, and could testify regarding Morrison's actions and behavior during this time. We have held that a conviction under § 1512 does not require proof that the proceeding in question actually was pending or about to be instituted at the time of the attempted obstruction; it requires only that the defendant "fear[ed]" that such a proceeding "had been or might be instituted," and "corruptly persuaded persons with the intent to influence their possible testimony in such a proceeding." *United States v. Kelley,* 36 F.3d 1118, 1128 (D.C.Cir.1994). And while Morrison assuredly didn't use the word "testify" or "trial" when he attempted to influence Holmes' behavior, the clear import of his request was that "anyone who asked" should be deceived; this understanding is reflected in Holmes' answer refusing to "perjure" herself, a term used almost exclusively with respect to testimony under oath. In sum, the jury was presented with sufficient evidence to support its verdict convicting Morrison of violating § 1512(b) by attempting to "corruptly persuade[ ] [Doris Holmes] ... with intent to influence [her testimony] in an official proceeding."

### III. CONCLUSION

Appellant was not denied the effective assistance of counsel guaranteed by the Sixth Amendment to the Constitution, and the district judge did not abuse his discretion by denying appellant's § 2255 motion without first holding an evidentiary hearing, or by limiting the cross-examination of government witness Paulette Glenn. The jury was provided with sufficient evidence to find appellant guilty of violating 18 U.S.C. § 1512(b) by attempting "corruptly" to influence the testimony of a potential witness in his trial. Appellant's convictions under § 924(c) must be reversed because the trial judge's instruction permitted the jury to return a guilty verdict based on an interpretation of that statute that was subsequently foreclosed by the Supreme Court in *Bailey v. United States.* Accordingly, we affirm all convictions except those for § 924(c) offenses, and we remand the case to the district court for resentencing.

*So ordered.*