# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 4, 2013          Decided December 27, 2013

Nos. 07-3135 & 07-3139

UNITED STATES OF AMERICA,
APPELLEE

v.

FREDERICK MILLER,
TIMOTHY R. THOMAS,
APPELLANTS

---

Appeals from the United States District Court
for the District of Columbia
(No. 04cr00379-02)
(No. 04cr00379-03)

---

*Dennis M. Hart*, appointed by the court, argued the cause and filed the joint brief for appellant Frederick Miller.

*David B. Smith*, appointed by the court, argued the cause and filed the joint brief for appellant Timothy R. Thomas.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *John K. Han*, Assistant U.S. Attorneys. *Mary B. McCord*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Frederick Miller, Gerald Eiland, and Timothy R. Thomas appeal their convictions stemming from a narcotics distribution scheme in Southeast, Washington, D.C. between 1999 and 2004. They and six others were indicted, and the district court conducted two trials. Miller and Thomas, along with Corey Moore, were tried first, and this opinion addresses Miller's and Thomas' challenges to their convictions. Miller was also part of the second trial involving Eiland with respect to the counts on which the jury hung at the first trial. Today the court issues simultaneous opinions in these complex cases addressing all of the challenges to the convictions.

Miller and Thomas challenge their convictions on multiple grounds, including that the district court erred in denying their motions to suppress the evidence obtained by the government through wiretaps placed on Miller's and Eiland's cell phones. This opinion incorporates the holding in *United States v. Eiland*, Nos. 07-3131 & 11-3001, slip op. at 8–15 (D.C. Cir. Dec. 27, 2013), that the district court did not abuse its discretion in denying the defense motions to suppress the wiretap evidence. Miller and Thomas also contend that the district court erred in permitting "overview" and lay opinion testimony by government agents, and testimony of a jailhouse confidant about their co-conspirators' statements. Further, they contend the district court erred in limiting the cross-examination of a key cooperating government witness, and in denying Thomas' motion for judgment because there was insufficient evidence to convict him of one of the communication facility counts and a corresponding racketeering act. They contend as well that the district court erred in allowing unredacted tape recordings and tape recordings

of their phone calls not played at the trial to go to the jury, and also impermissibly interfered with the jury's deliberations by responding to jury notes in a manner that instructed the jury about the grand jury's intent. In their reply brief, they contend the responses improperly amended the superceding indictment. They have withdrawn their Jencks/*Brady* challenge but contend the cumulative effect of the district court's errors requires reversal of their convictions.

We hold that Miller's and Thomas' evidentiary challenges and their contention regarding the submission of unplayed and unredacted phone calls fail to demonstrate that reversal of their convictions is warranted; such errors as occurred were harmless for lack of substantial prejudice. We further hold that the district court's responses to jury notes impermissibly interfered with the jury's independent role as the finder of fact, and we vacate the convictions on the tainted counts. The government concedes that the district court erred in imposing Thomas' sentences of life imprisonment in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and we vacate his life sentences for narcotics conspiracy and RICO conspiracy. Accordingly, we remand the case for resentencing and otherwise affirm the judgments of conviction.

**I.**

In March 2003, a joint task force of the Federal Bureau of Investigation ("FBI") and the D.C. Metropolitan Police Department began an investigation into a suspected narcotics distribution operation in Southeast, Washington, D.C. As a result of physical surveillance, use of cooperators, pen registers and toll records, undercover drug purchases, and execution of search warrants, the investigators suspected that Miller and Eiland were partners in drug distribution with at least ten others, among them Thomas. Upon obtaining judicial authorization of

wiretaps, the investigators intercepted calls made on the cell phones used by Miller and Eiland between February and June 2004.

The government's evidence, as relevant here, showed that Miller used several individuals as couriers of money and drugs. Between October 2003 and January 2004, Miller recruited his cousin Charles Brown to make five trips to Kansas City, Missouri to carry money. Miller also recruited Brown to make a similar trip to Los Angeles, California to carry money to Robert Bryant, whom investigators suspected of supplying Miller with PCP. On March 10, 2004, when Brown was scheduled to go to Los Angeles for Miller, he was stopped at the airport by Drug Enforcement Administration agents who seized $30,775 in cash from his person. In April 2004, Miller again recruited Brown, arranging for a package of heroin to be sent to Brown's residence; the package was intercepted by law enforcement officials who arranged a controlled delivery of the package to Brown's residence.

Tyrone Thomas (hereinafter "Tyrone," and no relation to Timothy R. Thomas) also acted as a courier for Miller. He was introduced to Miller by Thomas in 2000. In May or June 2003, Tyrone drove from Atlanta, Georgia to Los Angeles to meet with Miller and Bryant, who were planning to purchase PCP. After Tyrone returned to Atlanta, Bryant sent him a package of PCP to take to Miller in the District of Columbia. In March 2004, Tyrone transported a batch of "no good" PCP from the District of Columbia to Bryant in Kansas City. In March 2004 Miller also recruited Tyrone to act as a courier in regard to a purchase of four kilograms of powder cocaine in Phoenix, Arizona. Tyrone drove from Atlanta to meet with Miller and Thomas to discuss the new venture. Thomas then drove Tyrone to Eiland's apartment in Alexandria, Virginia, where Eiland instructed Tyrone to take $50,000 to Phoenix where he would

meet Eiland. In Phoenix, Eiland retrieved the funds and purchased four kilograms of powder cocaine, and then gave the drugs to Tyrone to transport to the District of Columbia. Wary of law enforcement, Tyrone put the drugs in a bag that he checked onto a Greyhound bus bound for Richmond, Virginia. When he arrived in Richmond three days later, Tyrone learned the bag had not arrived. The bag arrived two days later, on March 23, 2004, and Tyrone called to let Miller, Eiland, and Thomas know that he would be arriving shortly in the District of Columbia. Within thirty minutes of leaving Richmond, law enforcement officials stopped Tyrone's car and seized the four kilograms of cocaine in the trunk.

Tyrone spoke that day with the FBI and agreed to cooperate with law enforcement by making recorded phone calls to Thomas regarding the four kilograms of cocaine. During these calls, Tyrone communicated a law-enforcement improvised ruse. He initially told Thomas that the bag had been delayed and then lost in the Greyhound baggage system. Thomas expressed his anger that Tyrone allowed the bag out of his sight, suggested the bag had been stolen by Greyhound employees or seized by law enforcement, and warned Tyrone that he would have to pay for the lost drugs. Tyrone, as instructed by the FBI, also arranged to send Thomas a facsimile copy of his baggage claim ticket. On May 3, 2004, the FBI intercepted a call in which Tyrone told Thomas that he had located the bag in Spartanburg, South Carolina but the cocaine was missing. When other intercepted calls indicated that Miller, Eiland, and Thomas suspected that Tyrone had stolen the cocaine, the investigators told Tyrone to confirm his cohorts' suspicions. In a May 4, 2004 call, Tyrone admitted to Thomas that he had stolen the cocaine but offered to return one kilogram in recognition of their past friendship. Thomas agreed to have Tyrone leave the cocaine at a hotel room where he could retrieve it. Investigators set up a reverse sting on May 19, 2004, planting the kilogram in a hotel room in

Alexandria. When one of Thomas' associates, Greta Frank, came to the room and retrieved the cocaine, she was arrested.

Search warrants were executed between May and July 2004. Recovered from Miller's house and his aunt's house (which Miller frequently used) were tools of the drug trade, including drug packaging materials and two bulletproof vests. Recovered from Thomas' apartment were a digital scale, counterweights, small empty ziploc bags and ziploc bags containing 0.41 grams of cocaine, a "Cocaine Handbook," and a telephone "bug" detector.

On March 20, 2006, the grand jury returned a superceding 71-count indictment against Miller, Eiland, Thomas, and six co-defendants. Miller and Thomas were charged with conspiracy to distribute and possess with intent to distribute narcotics, 21 U.S.C. § 846; conspiracy to violate the RICO Act, 18 U.S.C. § 1962(d); distribution, possession, and attempted possession with intent to distribute ("PWID") narcotics, 21 U.S.C. §§ 841(a)(1), 841(b)(1), 846; unlawfully using a communication facility, 21 U.S.C. § 843(b); conspiracy to commit murder, D.C. CODE §§ 22-1805a, 22-2101; and conspiracy to murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(5). Miller was also charged with engaging in a continuing criminal enterprise ("CCE"), 21 U.S.C. § 848(a)–(b). *See also Eiland*, slip op. at 3–5. The district court denied the defense motions to suppress the wiretap evidence. *United States v. Eiland*, 398 F. Supp. 2d 160 (D.D.C. 2005). At the close of all the evidence, the district court granted the government's motion to dismiss two PWID counts and eight communication facility counts against Miller, as well as both murder conspiracy counts.

The jury found Miller guilty of twenty-one counts of unlawfully using a communication facility, and not guilty of one count of possession with intent to distribute PCP and sixteen

counts of unlawfully using a communication facility. The jury hung on the remaining charges against Miller, including narcotics conspiracy, RICO conspiracy, CCE, two counts of attempted PWID, and seven counts of unlawfully using a communication facility. Miller was sentenced after the jury in the second trial returned verdicts on the hung counts. *See Eiland*, slip op. at 4–6. The jury found Thomas guilty of narcotics conspiracy, RICO conspiracy, PWID cocaine, and ten counts of unlawfully using a communication facility; he was acquitted of the remaining count of unlawfully using a communication facility. The district court sentenced Thomas to life imprisonment for narcotics conspiracy and RICO conspiracy, twenty years for PWID cocaine, and four years for each communication facility offense, all to be served concurrently. The district court denied the defense motions for a new trial. *See United States v. Eiland*, 525 F. Supp. 2d 37 (D.D.C 2007), *rev'd on other grounds*, *United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012); *United States v. (Timothy) Thomas*, 525 F. Supp. 2d 17 (D.D.C 2007).

## II.

**Overview Testimony**. Miller and Thomas contend that the trial testimony of FBI Agents Daniel Sparks and Scott Turner and Detective Steven Hall (a former FBI Agent) ran afoul of this court's precedents limiting the permissible use of "overview" or "summary" witnesses and lay opinion testimony. They point to the testimony on (1) the procedures for obtaining wiretaps and search warrants; (2) the methods used to ensure the truthfulness of cooperating witnesses; (3) the nature of criminal enterprises and the techniques used to investigate them; and (4) the meaning and significance of wiretapped phone calls. This testimony, Miller and Thomas maintain, unfairly allowed the prosecution to bolster the strength of its case and deprived them of a fair trial. Properly understood, Miller's and Thomas' objections

concern both overview and lay opinion testimony.  Here, we address the former; we address the latter in Part III, *infra*.

In *United States v. Lemire*, 720 F.2d 1327, 1348–49 (D.C. Cir. 1983), this court identified three "obvious dangers" posed by "summary" testimony: (1) "a jury will treat the summary as additional evidence or as corroborative of the truth of the underlying testimony," (2) the testimony will result in "the subtle introduction of otherwise inadmissible evidence," and (3) the testimony will "provide an extra summation for the government that comes from the witness stand rather than the counsel's lectern."   A clear illustration of these "obvious dangers" occurred in *United States v. Moore*, 651 F.3d 30, 54–55 (D.C. Cir. 2011), where Agent Sparks' trial testimony provided at the outset of the trial "an overview of the government's case, setting forth for the jury the script of the testimony and evidence the jury could expect the government to present in its case-in-chief" and "expressed his opinion, based on his training and experience, about the nature of the investigation conducted in th[e] case."   This court held his testimony "was improper in offering his non-expert opinions about the charged conspiracy and [the defendants], vouching for the reliability of the investigation and of the cooperating co-conspirator witnesses the government planned to have testify at trial, and discussing evidence that had yet to be introduced." *Id.* at 60.  More generally, the court "condemn[ed]" the use of overview witnesses in criminal trials "[b]ecause a witness presenting an overview of the government's case-in-chief runs the serious risk of permitting the government to impermissibly 'paint a picture of guilt before the evidence has been introduced' and may never be introduced." *Id.* (citation omitted) (quoting *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003)).

In *Moore*, the court set forth "clear direction" that "[t]he government remains free to call as its first witness a law

enforcement officer who is familiar with the pre-indictment investigation or was otherwise personally involved," and such a witness may "provide relevant background information as to the investigation's duration and scope or the methods of surveillance, based on personal knowledge." *Id.* at 60–61. Thus, in a narcotics conspiracy prosecution, a government agent "could properly describe, based on his personal knowledge, how the gang investigation . . . was initiated, what law enforcement entities were involved, and what investigative techniques were used." *Id.* at 61. On the other hand, the government agent could not (1) "present lay opinion testimony about investigative techniques in general and opine on what generally works and what does not," (2) "anticipate evidence that the government would hope to introduce at trial about the charged offenses," or (3) "express an opinion, directly or indirectly, about the strength of that evidence or the credibility of any of the government's potential witnesses, including the cooperating co-conspirators." *Id.*

Miller and Thomas contend that FBI Agent Sparks' testimony about procedures for obtaining search warrants and wiretaps, and similar testimony by FBI Agent Turner, "crossed the line by advancing the argument that multiple layers of court and prosecutor review served [as] an independent approval of the agents' conclusions of illegality." Appellants' Br. 54. In discussing search warrants, Sparks testified "we have to provide facts and justify to a judge why we need to get a search warrant" and described how an application is "reviewed by the U.S. Attorney's Office, and then it goes to a Federal Magistrate Judge who reviews it to decide whether or not they'll issue a search warrant." Mar. 21, 2006 PM Trial Tr. at 14. Sparks also testified that a wiretap is "a court order that allows law enforcement to listen to and monitor private conversations," and that investigators prepare "daily reports that go to the U.S. Attorney's Office," as well as "a ten or fifteen day report to the

Court," in order for the court to "monitor the status of the wiretap." *Id.* at 17–18. FBI Agent Turner described how a wiretap application is approved by the U.S. Attorney's Office, the Justice Department, and the FBI's legal counsel before it is sent to a judge who "either authorizes or denies it." Mar. 22, 2006 AM Trial Tr. at 85. Although the "layering" testimony about multiple levels of approval can be overdone in a manner that would substantiate Miller's and Thomas' concern, *see United States v. Cunningham*, 462 F.3d 708, 712–15 (7th Cir. 2006), they raised no objection in the district court. Upon plain error review, *see United States v. Olano*, 507 U.S. 725, 732–34, 736 (1993); *United States v. Bailey*, 319 F.3d 514, 521 (D.C. Cir. 2003), we conclude that this testimony by Sparks and Turner was not so extreme as to suggest, in the absence of a limiting instruction, that the suspicions of investigators about the defendants were confirmed because the applications were subject to multiple layers of review; rather, the agents addressed the lawfulness of investigative conduct, which was not the same as evidence of a defendant's guilt.

Miller and Thomas also contend that FBI Agent Sparks' testimony about the investigation of criminal enterprises in general was impermissible. This court has drawn a line between permissible lay opinion testimony under Federal Rule of Evidence 701 and expert opinion testimony under Rule 702. In *Moore*, 651 F.3d at 61, the court held that a government agent could not "present lay opinion testimony about investigative techniques in general." Thus, "[a]n individual testifying about the operations of a drug conspiracy because of knowledge of that drug conspiracy . . . should be admitted as a lay witness; an individual testifying about the operations of a drug conspiracy based on previous experiences with other drug conspiracies . . . should be admitted as an expert." *United States v. (George) Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010). The court has "drawn that line because knowledge derived from previous

11

professional experience falls squarely 'within the scope of Rule 702' and thus by definition outside of 701." *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (quoting FED. R. EVID. 701(c)).

FBI Agent Sparks' testimony about criminal enterprises and investigative techniques appeared to be premised on his specialized knowledge as a criminal investigator, rather than his particularized knowledge of how the Miller/Eiland drug operation was investigated. As such, its admission was plainly erroneous. *See Moore*, 651 F.3d at 61; *(George) Wilson*, 605 F.3d at 1026. Although this court had not decided *Moore* or *(George) Wilson* at the time of Miller's and Thomas' trial, the Supreme Court held in *Henderson v. United States*, 133 S. Ct. 1121, 1130–31 (2013), that an error need only be "plain" at the time of appellate consideration. In the district court, Miller and Thomas objected to Sparks' testimony with respect to how a criminal enterprise maintains secrecy, but not to Sparks' overview of the investigative techniques used to infiltrate criminal enterprises. Regardless of whether the objection to the error was preserved as to all of Sparks' testimony, Miller and Thomas cannot show substantial prejudice. *See Olano*, 507 U.S. at 734; *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). As the court observed in *Moore*, Sparks might have qualified as an expert because he had been an FBI agent for over fifteen years and had served as the lead agent in five or six criminal enterprise investigations. *See Moore*, 651 F.3d at 61; *Smith*, 640 F.3d at 366.

On the other hand, the government acknowledges that Miller's and Thomas' objection to FBI Agent Sparks' vouching testimony is well taken, stating "this Court has since disapproved of the kind of testimony Sparks gave about the importance and handling of cooperators." Appellee's Br. 53 (citing *Moore*, 651 F.3d at 59–60). Sparks testified not only that

cooperating witnesses are used because they are "easily accepted by the criminals that we're investigating" and "have access to the insiders," Mar. 21, 2006 PM Trial Tr. at 13–14, 20, but about how investigators ensure that cooperating witnesses are truthful, including checking to determine if what they say is consistent with other evidence, such as "an autopsy report, or a crime scene report, or a police report, or airline reservations, or . . . a pen register, or . . . a wiretap . . . [to] get a sense whether or not they're telling the truth." *Id.* at 21–22. Moreover, Sparks testified — in response to a series of questions from the prosecution impermissibly prompting answers that would invade the jury's right to make credibility determinations, *see United States v. Boyd*, 54 F.3d 868, 871–72 (D.C. Cir. 1995) — that any cooperating witness who would testify at trial or on whom the government had relied in the instant case was a truth teller.

Vouching testimony of this kind is impermissible because it manifests the "obvious danger[]" that "a jury will treat [a summary witness, particularly a government agent] as additional evidence or as corroborative of the truth of the underlying testimony." *Lemire*, 720 F.3d at 1348. But Miller and Thomas have not shown the error affected their substantial rights, *see Olano*, 507 U.S. at 734; *Kotteakos*, 328 U.S. at 776, because any prejudice from the vouching testimony was adequately mitigated. *See United States v. Brown*, 508 F.3d 1066, 1074 (D.C. Cir. 2007). The district court instructed the jurors that they were "the sole judges of the credibility of the witnesses," and they "alone [we]re to determine whether to believe any witness and the extent to which any witness should be believed." May 25, 2006 PM Trial Tr. at 15. Testimony from the government's primary cooperating witness, Tyrone, was heavily impeached on cross-examination. *See* Part V *infra*. And, on the counts on which the jury returned guilty verdicts, as in *Moore*, 651 F.3d at 61, there was overwhelming evidence of Miller's and Thomas' guilt, independent of any cooperator testimony, in

view of the numerous taped phone conversations and the four kilograms of cocaine seized from Tyrone that incriminated both Miller and Thomas.

## III.

**Lay Opinion Testimony**. Miller's and Thomas' challenge to the lay opinion testimony by FBI Agents Sparks and Turner and Detective Hall focuses on the witnesses' interpretation of the recorded phone conversations. The government's suggestion that this challenge was not preserved because Miller and Thomas fail to describe specific instances that "actually led to the introduction of damaging evidence against them," Appellee's Br. 54 (citing *United States v. Hall*, 370 F.3d 1204, 1209 n.4 (D.C. Cir. 2004)), is not well taken. All of the taped phone calls were admitted into evidence and incriminating tapes were played at trial. On appeal, Miller and Thomas renew their objections in the district court that portions of the interpretative testimony lacked a foundation or basis. *See* Appellants' Br. 49–50, 53.

In *United States v. Hampton*, 718 F.3d 978, 981–82 (D.C. Cir. 2013), the court held that the district court abused its discretion by admitting lay opinion testimony by a government agent that did not satisfy the requirements of Rule 701. The court emphasized that "[e]nforcement of Rule 701's criteria . . . ensures that the jury has the information it needs to conduct an independent assessment of lay opinion testimony." *Id.* at 781. "Judicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes." *Id.* at 781-82. Because the government agent's testimony was broadly based on his "'knowledge of the entire investigation,'" the court concluded that "the jury had no way of verifying [the agent's]

14

inferences or of independently reaching its own interpretations."
*Id.* at 983 (quoting *United States v. Grinage*, 390 F.3d 746, 750
(2d Cir. 2004)); *accord United States v. Albertelli*, 687 F.3d 439,
450 (1st Cir. 2012); *United States v. Garcia*, 413 F.3d 201,
212–13 (2d Cir. 2005); *Grinage*, 390 F.3d at 750–51.

FBI Agents Sparks and Turner and Detective Hall offered
their lay opinions regarding the meaning and "significance" of
certain wiretapped phone conversations.  Turner testified over
several days, often opining based on "the overall state of the
investigation," his "overall knowledge of the investigation," his
"perceptions in this case," and other similarly general bases.
*See, e.g.*, May 23, 2006 PM Trial Tr. at 26.  He also testified
about the meaning of coded language in phone conversations, *id.*
at 51, although "[i]n this case we didn't really see any consistent
use of any code words indicating any drugs," *id.* at 53.  Sparks
and Detective Hall likewise interpreted the meaning of recorded
phone conversations based on their "knowledge of the overall
investigation," or similar generalized bases, such as "knowledge
that [they] received in this investigation," and "the wiretap in
general."  *See, e.g.*, Apr. 24, 2006 AM Trial Tr. at 38–39, 45.

Admission of the government agents' interpretative lay
opinion testimony was plain error under *Hampton*.  Their
interpretations of non-coded language was erroneously admitted
because they did not set forth the specific bases (events, other
calls, seizures of contraband, etc.) upon which their opinions
rested — other than broad claims about knowledge they had
gained from the investigation.  *See Hampton*, 718 F.3d at
981–82.  This gave the jury no effective way to evaluate their
opinions.  But, unlike in *Hampton*, the error was not
substantially prejudicial.  *See id.* at 984 (citing *Kotteakos*, 328
U.S. at 765).  The prejudice in *Hampton* was apparent from the
absence of other evidence to support the convictions. There, the
government pointed to no "money, drugs, weapons, or other

evidence seized by law-enforcement personnel that could be tied to Hampton's alleged role in the conspiracy." *Id.* Here, the opposite is true: the government points to the seized evidence, most particularly to the four kilograms of cocaine seized from Tyrone's car that were tied to Miller and Thomas not only through Tyrone's testimony but also by the consensually recorded phone conversations between Thomas and Tyrone that were not interpreted by government agents at trial.

**IV.**

**Co-Conspirator Statements**. Miller and Thomas contend that the district court erred by permitting Melvin Wider to testify regarding conversations he had with Eiland and Robert Bryant (neither of whom was a defendant in the first trial) because these conversations were made neither during nor in furtherance of a conspiracy, and thus constituted inadmissible hearsay. We agree. *See United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010).

Under Federal Rule of Evidence 801(d)(2)(E), a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). Statements are made in furtherance of a conspiracy if they "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Such statements include "those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006) (citations and internal quotation marks omitted). On the other hand, "mere narratives of past successes

and failures" or "a conspirator's casual comments to people outside or inside the conspiracy" are not admissible under Rule 801(d)(2)(E). *Tarantino*, 846 F.2d at 1412 (internal quotation marks omitted).

Wider met Eiland and Bryant while they were all incarcerated in the Montgomery County (Maryland) jail in 2005 after Eiland and Bryant had been arrested and charged in the Miller/Eiland drug conspiracy. At that time, Wider had pleaded guilty to a different RICO conspiracy than was charged in the instant case, and he was cooperating with law enforcement officials. According to Wider, Eiland and Bryant told him about Bryant providing PCP to Miller, Thomas' involvement in the Phoenix cocaine transaction, and Miller's involvement in a private investigative service that Wider claimed was used as a front for a murder-for-hire operation. The prosecution proffered that Wider had been enlisted in the conspiracy while incarcerated by helping Bryant make contact with a woman in Kansas City named Shantel who had previously obtained cell phones and stored drugs for Bryant, and by assisting Miller, Eiland, and Corey Moore in contacting Bryant while incarcerated, in violation of a separation order. The district court denied Thomas' motion to exclude Wider's testimony, ruling it was admissible under Rule 801(d)(2)(E).

The admission of Wider's testimony was error, not because of lack of independent evidence of a conspiracy, but because none of the statements to Wider by Eiland or Bryant can be construed as in furtherance of the conspiracy, which ended in September 2004, several months before any of the statements were made to Wider. There is no evidence that either Eiland or Bryant did anything after their respective August and October 2004 arrests to carry out the goals of the conspiracy, and their statements cannot "plausibly be interpreted" as advancing the conspiracy. *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C.

Cir. 1995). Rather, the co-conspirators' statements recounted "past victories and losses" and were "casual comments," *Tarantino*, 846 F.2d at 1412, or "idle chatter," *see Carson*, 455 F.3d at 366–67. The government' suggestion that statements recounted by Wider describing the conspiracy's drug trafficking and other illegal activities were made in furtherance of the conspiracy because they "'updated' Wider about the status of the drug trafficking business, and provided 'background information' on the conspiracy's members," Appellee's Br. 63 (quoting *Carson*, 455 F.3d at 367), ignores the temporal element of the conspiracy and the absence of any evidence the speakers were attempting to induce Wider to join or provide assistance to the terminated conspiracy, as occurred in *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). The other cases cited by the government involved on-going conspiracies, *United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005), or statements by one co-conspirator to another, *United States v. Weaver*, 507 F.3d 178, 183 (3d Cir. 2007); *Carson*, 455 F.3d at 367.

Despite the error, there was no substantial prejudice to either Miller or Thomas. *See Kotteakos*, 328 U.S. at 776. Wider's testimony that inculpated Miller related to counts that were either dropped by the prosecution before the case was submitted to the jury or on which the jury did not convict him, namely Counts 1–7, 68, and 69. Wider's testimony that inculpated Thomas related to the four-kilogram Phoenix cocaine transaction and was cumulative of other evidence.

## V.

**Cross-Examination of Cooperating Witness**. Miller and Thomas also contend that the district court abused its discretion by limiting cross-examination of Tyrone and thereby violated their confrontation rights under the Sixth Amendment. We find

neither an abuse of discretion, *see United States v. White*, 116 F.3d 903, 919 (D.C. Cir. 1997), nor constitutional error.

The Sixth Amendment guarantees a criminal defendant the right to cross-examine the witnesses called against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Although the Confrontation Clause guarantees an opportunity for effective cross-examination, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination." *Id.* at 679. "The Confrontation Clause is violated only when the court bars a legitimate line of inquiry that 'might' have given the jury a 'significantly different impression of [the witness's] credibility.'" *United States v. Hayes*, 369 F.3d 564, 566 (D.C. Cir. 2004) (alteration in original) (quoting *Van Arsdall*, 475 U.S. at 680).

Under Federal Rule of Evidence 608(b), a party may inquire on cross-examination about "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," so long as the specific instances of conduct "are probative of the character for truthfulness or untruthfulness." FED. R. EVID. 608(b). Additionally, "evidence that would contradict [a witness's] trial testimony, even on a collateral subject," is ordinarily probative because it "would undermine [the witness's] credibility as a witness regarding facts of consequence." *United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006). In considering whether a topic is probative of untruthfulness, the district court "is guided by several factors, including whether the instances of prior untruthfulness bore some similarity to the conduct at issue, whether or not they were remote in time, whether they were cumulative of other evidence, and whether there was some likelihood they happened." *United States v. Simonelli*, 237 F.3d 19, 23 (1st Cir. 2001); *accord United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996). It is within the district court's discretion to balance these factors

to decide whether the conduct at issue is sufficiently probative of the witness's character for untruthfulness to be admitted under Rule 608. *See Morrison*, 98 F.3d at 628.

At trial, the defense sought to cross-examine Tyrone regarding his kidnaping trial in St. Louis in 1975. In that trial, the district court had ordered a psychological evaluation of Tyrone. *See United States v. (Tyrone) Thomas*, 536 F.2d 274, 275 (8th Cir. 1976). After the district court had found Tyrone was incompetent to stand trial in view of a diagnosis that he suffered from paranoid schizophrenia, two doctors who subsequently reexamined him "observed a revealing and sudden improvement in [Tyrone's] behavior after the first competency hearing." *Id.* at 276. One psychiatrist concluded that Tyrone "had simply succeeded in fooling the psychiatrists at the outset," and a psychologist testified that Tyrone had admitted to her that he had feigned his mental illness. *Id.* Cross-examination about his 1975 criminal trial was proper, appellants maintain, under Federal Rule of Evidence 608(b) as probative of Tyrone's character for untruthfulness, because it would "show that Tyrone had attempted to perpetrate a fraud on the federal court in St. Louis." Appellants' Br. 67. The district court ruled "[i]t's so extraneous, and so beyond anything beyond the pale, I'm not going to allow it." Apr. 3, 2006 PM Trial Tr. at 51.

The defense also sought to cross-examine Tyrone about his alleged attempt to shoot someone when he was 13 years old (in approximately 1961) in order to impeach his testimony on direct examination that he "started having a lot of problems when [he] came back from Vietnam," including drug use, several run-ins with the law, and the onset of post-traumatic stress disorder ("PTSD"). Mar. 29, 2006 PM Trial Tr. at 40. When the prosecution objected to the question, counsel for Corey Moore argued "[t]he government opened the door when [it] elicited from [Tyrone] that all of this criminal activity was the result of

[PTSD] in Viet Nam [sic]. We had a basis by his own admission to say there was conduct that preceded [that]." Apr. 3, 2006 PM Trial Tr. at 84. The district court, which treated any defense objection as an objection by all defendants, sustained the prosecution's objection.

We hold that the district court did not abuse its discretion in prohibiting these two lines of questioning on cross-examination. Not only were the events over thirty years old, the suggestion that Tyrone had attributed all of his criminal behavior to his experiences in Vietnam is incorrect. The probativeness of the inquiry into what happened at the 1975 trial was diluted both by its remoteness in time, *see, e.g.*, *United States v. Augustin*, 661 F.3d 1105, 1128 (11th Cir. 2011), and by the fact that the cross-examination would have been based on accusations, not a prior judicial finding Tyrone had lied in 1975 about his mental state. *Compare United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004), *with Morrison*, 98 F.3d at 628. *See generally (Tyrone) Thomas*, 536 F.2d at 275–77. Similarly, even if inquiry into Tyrone's attempt to shoot someone when he was 13 years old would have been impeachment-by-contradiction, because "[t]he evidence of Tyrone's violent juvenile conduct directly contradicted his testimony that his criminal activity was caused by [PTSD] stemming from his service in Vietnam," Appellants' Br. 71, any contradiction would have been ambiguous because Tyrone had not testified on direct examination that he had *never* engaged in criminal misconduct prior to serving in Vietnam; on cross-examination he explained he had claimed only that his "criminal involvement was *principally related* to [his] coming back from Viet Nam [sic]." Apr. 3, 2006 PM Trial Tr. at 82 (emphasis added).

We also hold that the district court's limitation on Tyrone's cross-examination did not violate Miller's or Thomas' Sixth Amendment rights. They maintain "[t]he cross[-examination]

that was not permitted would have been 'almost unique in its detrimental effect on [Tyrone's] credibility.'" Appellants' Br. 73 (quoting *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996)). But at trial defense counsel attacked Tyrone's credibility by cross-examining him about numerous other instances of prior misconduct, including arrests, violating conditions of release, and lying to law enforcement and a bankruptcy court. Under the circumstances, there is no basis to conclude that a reasonable jury would have "received a significantly different impression of [Tyrone's] credibility had [defense] counsel been permitted to pursue [the] proposed line[s] of cross-examination." *Van Arsdall*, 475 U.S. at 680.

## VI.

**Sufficiency of Evidence**. Thomas contends there was insufficient evidence to convict him of Count 33 and Racketeering Act 5(a). Count 33 charged Miller and Thomas with unlawfully using a communication facility, that is, a telephone, on or about March 5, 2004 at 12:30 p.m., to facilitate the conspiracy to unlawfully distribute or possess with intent to distribute heroin, cocaine, crack cocaine, and PCP. Racketeering Act 5(a) charged them with unlawfully using a communication facility, that is, a telephone, to facilitate the unlawful distribution of PCP in the RICO conspiracy. This court "review[s] the evidence of record *de novo*, considering that evidence in the light most favorable to the government, and affirm[s] a guilty verdict where '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The essential elements of unlawfully using a communication facility are: (1) knowing or intentional use;

(2) of a communication facility; (3) in committing or in causing or facilitating the commission of any act constituting a drug-related felony. 21 U.S.C. § 843(b). The evidence showed that at 12:29 p.m. on March 5, 2004, Miller called Thomas, and when Thomas answered his phone Miller told him that although he was "running a little behind" he "wanted to see [Tyrone] anyway." Miller asked Thomas whether Miller could "hollar [sic] at" Tyrone; Thomas replied, "Alright." The next voice on the tape is Tyrone's. Miller proceeded to tell Tyrone: "I want to see you because I got something, something for you. Information." Miller and Tyrone arranged to meet. Other recorded phone calls and Tyrone's trial testimony established that Tyrone met Miller on March 5, 2004, to arrange for the transporting of PCP to Kansas City. Although Tyrone testified at trial that Miller initially contacted him to arrange transport of PCP "in or around . . . February of 2004" (when Tyrone was still in Atlanta), Mar. 28, 2006 PM Trial Tr. at 42, viewing the evidence most favorably to the government indicates that the face-to-face meeting between Miller and Tyrone was arranged during the recorded phone calls on March 5, 2004. *See Wahl*, 290 F.3d at 375. Tyrone testified that this meeting took place at Thomas' residence in the District of Columbia, that Thomas was present at the time, and that at the meeting Miller told Tyrone he was to take a batch of "no good" PCP to Robert Bryant in Kansas City. Thomas' presence at the meeting is partially corroborated by another taped phone call on March 5, 2004 in which Miller told Thomas that he was "downstairs."

Thomas maintains that "the fact that [he] was with Tyrone, answered the phone and then handed the phone to Tyrone, does not permit a jury to find beyond a reasonable doubt that [he] knowingly facilitated the distribution of PCP through the use of the telephone." Appellants' Br. 108. Mere association is not enough. *See id.* (citing *United States v. Webster*, 639 F.2d 174, 188 (4th Cir. 1981)). Although the question is close, we hold

that the evidence was sufficient when viewed in the context of Miller's and Thomas' activities. The evidence established that they had used Tyrone as a drug courier prior to March 5th. This context would permit a reasonable inference that Thomas knew what Miller had in mind when he asked Thomas to "hollar [sic] at" Tyrone. Viewed most favorably to the government, the evidence sufficed to show, given the nature of Miller's and Thomas' drug-related activities, that Thomas knew that the purpose of the March 5, 2004 meeting was to arrange for the interstate transport of illegal drugs, and he helped to arrange it by his use of a phone, even assuming his knowing use of a phone on March 5, 2004 may have played a comparatively small part in facilitating the transaction.

## VII.

**Unredacted and Unplayed Tapes to Jury**. Prior to commencement of the jury deliberations, the district court addressed which tape recordings should be sent to the jury. All the tapes had been admitted into evidence, *see (Timothy) Thomas*, 525 F. Supp. 2d at 34, but only certain tapes were played for the jury during the trial and some of those were played selectively, with the prosecution stopping the tape recording in accordance with an agreement with defense counsel. At the conclusion of the presentation of evidence, defense counsel, who were not in agreement whether all of the recorded calls should be sent to the jury, requested the district court to allow them the opportunity to request redaction of any tapes sent to the jury that had not been played during the trial. The district court granted the defense request, ruling that "if a call that wasn't played in the courtroom is going to go to the jury, [the defense must] know[] about it, and if it has something that should be redacted, [the defense] can get it redacted." May 22, 2006 AM Trial Tr. at 132–33. The district court also instructed the jury that it would receive "computer dis[c]s of all

the calls that were actually played during the trial," and that if the jury "want[ed] to listen to additional calls . . . [it should] [s]end a note to the Court" and "[t]he Court will then discuss the note and/or request with counsel and make arrangements for the jury to inspect the specific item of evidence that the jury has requested." May 25, 2006 PM Trial Tr. at 77–78.

When the prosecution provided defense counsel with the two CDs containing recorded calls, however, an accompanying letter stated that "the audio files were copied as they were originally intercepted," the government "could not redact or copy only a portion of a call," and, consequently, "any self-censorship that the prosecution or the defendants employed during the trial will not occur if the jury chooses to listen to those calls." The letter suggested defense counsel confer with their clients "and if this needs to be addressed with the Court, we should do so before the Court provides the jury with the 2 CDs." The record does not indicate that either the prosecution or defense counsel brought the non-redaction circumstance to the district court's attention before the CDs were sent to the jury. Miller's trial counsel's "recollection is that he objected to the 'calls played [on the] CD' going back to the jury without redaction," Appellants' Br. 88 n.59, but this occurred before the district court's ruling, when defense counsel were not in agreement about which calls should go to the jury. In addition to the unredacted calls played at trial, unplayed calls were also on the CDs that were sent to the jury. *See id.* at 87; Appellee's Br. 83 n.79.

Miller and Thomas contend the submission of unredacted and unplayed taped phone calls to the jury was reversible error. They suggest the circumstances are similar to those in *United States v. Lampkin*, 159 F.3d 607 (D.C. Cir. 1998); *United States v. Cunningham*, 145 F.3d 1385 (D.C. Cir. 1998); and *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996). These cases

involved violations of the Confrontation Clause. *Lampkin*, 159 F.3d at 613–14; *Cunningham*, 145 F.3d at 1393; *see also Noushfar*, 78 F.3d at 1445. Any statements in the unplayed phone conversations made during and in furtherance of the drug conspiracy, *see* FED. R. EVID. 801(d)(2)(E), could be admitted without violating the Confrontation Clause. *See Carson*, 455 F.3d at 365 (citing *Bourjaily v. United States*, 483 U.S. 171, 182–84 (1987)); *see also Crawford v. Washington*, 541 U.S. 36, 56 (2004). None of the eight unplayed phone calls identified by Miller and Thomas was consensually recorded, and therefore "cannot be deemed 'testimonial' as the speakers certainly did not make the statements thinking that they 'would be available for use at a later trial.'" *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (quoting *Crawford*, 541 U.S. at 52). The holding in *Noushfar*, 78 F.3d at 1445, that the "tapes went to the jury room in violation of [Federal] Rule [of Criminal Procedure] 43," is inconsistent with this court's holding that "tape replaying [is] not a stage of trial implicating the confrontation clause or Rule 43(a)," *United States v. Sobamowo*, 892 F.2d 90, 97 (D.C. Cir. 1989).

Sending the unplayed and unredacted played phone calls to the jury, however, violated the district court's ruling that only portions of played calls were to be sent to the jury and, as to unplayed calls requested by the jury, the defense would have an opportunity to seek redactions. *Cf. Dallago v. United States*, 427 F.2d 546, 555 (D.C. Cir. 1969). This error by the prosecution, avoidable through the exercise of reasonable diligence, was fundamentally unfair. The defense was deprived of the benefit of the district court's ruling that only the played portions of calls were initially to be sent to the jury and that if the jury were to request unplayed calls, the defense would have the opportunity to seek redactions. Also, to the extent the jury received on the CDs a biased sampling of unplayed calls that the prosecution had intended to play at trial, the defense was caught

off guard and no longer had the ability to place the unplayed calls in context or otherwise try to mitigate their weight for the jury.

Although the error was obviously serious because it involved a violation of the district court's ruling, Miller and Thomas fail to demonstrate the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776. The eight examples of unplayed calls sent to the jury that Miller and Thomas maintain were inculpatory include only one (# 8627) that may have warranted redaction in view of the foul language used by Miller and Eiland. But given the extensive use of foul language in the recorded phone calls, this one instance is insufficient to constitute substantial prejudice. Sending the unredacted tapes that were only partially played at trial to the jury also caused no substantial prejudice; the references to Thomas' time in prison and what his brief describes as the "shanking" of another inmate, Appellants' Br. 86, were brief and too obscure to discern their meaning.

## VIII.

**Responses to Jury Notes**. After commencement of the jury's deliberations, the jury sent a series of notes to the district court. Miller and Thomas renew the defense objections to the district court's responses to six jury notes, contending that by allowing itself to be enlisted in the fact-finding process, the district court usurped the jury's exclusive role and thereby deprived them of their Sixth Amendment right to trial by jury. They rely principally on *United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004), where this court held that the district court had abused its discretion by permitting counsel for both parties to make supplemental arguments to the jury in response to its factual questions after it had begun deliberating. Miller and

Thomas maintain the situation at their trial was even worse because the district court placed its imprimatur on the prosecution's effort to supply the jury with what the prosecution deemed to be the correct answers to the jury's factual inquiries. In their view, "the [district] court did not . . . independently determine that these calls were the ones at issue," but instead "simply took the government's word for [it]." Appellants' Br. 38.

Jury Note 1. On May 30, 2006, the second day of deliberations, the jury sent a note stating there was an "error in the verdict form [and] the indictment." The note stated that phone calls for communication facility offenses Counts 19, 20, and 21 were "listed as" taking place on specific dates and times in the verdict form and the indictment, but for each count "no such call exists." The jury asked the district court whether the counts were "meant to be" particular recorded phone calls (which the jury identified for each count by "activation [numbers]") that had been entered into evidence at trial. For example, the jury note stated: "Count 20 — listed as Feb. 20, 2004 9:51 *p.m.* [N]o such call exists. Is this meant to be activation # 527 at 9:51 *a.m.*?" (emphasis added). The jury asked similar specific questions for Counts 19 and 21. Over defense objection to the district court's proposed response as improperly amending the indictment, the district court responded "yes" as to each count.

Jury Note 2. On May 31, 2006, the jury asked for "clarification of the verdict form" and posed two different kinds of questions in its note to the district court. First, the jury asked whether the times and dates of phone calls listed in communication facility offenses Counts 34, 40, and 45 were "meant to be" particular recorded phone calls entered into evidence. For example, the jury note stated: "Count 34 — listed [on the verdict form] as March 5, 2004 10:43 a.m. No such call

exists.  Is this meant to be call # 2877 on March *6*, 2004 10:43 a.m. [which date and time is listed in the indictment]?" (emphasis added).  The jury asked similar specific questions about Counts 40 and 45 regarding a.m./p.m. and 2-minute differences, respectively.  The jury note also stated: "Count 41 — listed [in the indictment and verdict form] as March 10, 2004 11:37 am.  We can find no such call.  Please advise on the location or corrected call [number]."  Over defense objections to impermissible variances between the evidence and the indictment, the district court answered "yes" as to counts 34, 40, and 45.  As to Count 41, the district court stated: "The answer is that activation # 3594, March 10, 2004, at 11:37 a.m. was introduced into evidence and played in Court, but was inadvertently not included in those previously provided to the jury.  It is now provided."

Jury Notes 3 & 4.  At 9:30 a.m. on June 1, 2006, the jury asked about phone calls listed in communication facility offenses Counts 57, 59, and 62.  The jury note stated: Count 57 was "listed [in the indictment and the verdict form] as April 7, 2004 7:09 p.m." but "[n]o such call exists."  "Is this meant to be call # 8459 at April 7, 2004 7:07 p.m.?"  As to Counts 59 and 62**,** the jury note stated that "no . . . call exists" for the date and time listed in the verdict form and asked the district court: "Please advise to the intended call."  At 11 a.m., the jury sent a fourth note asking about phone calls listed in communication facility offenses in Counts 46, 47, and 63–67.  As to the dates and times listed in the verdict form for Counts 46, 47, and 63, the jury note stated: "No such call[s] exist[]," and asked: Were Counts 46, 47, and 63 "meant to be," respectively, activation numbers 5659, 5830, and 13554?  For Count 64, listed in the indictment as occurring on or about May 4, 2004 5:24 p.m, "[t]wo such call[s] exist[].  Is this meant to be call # 13556 May 4, 2004 5:25 p.m. *or* call # 980 May 4, 2004 at 5:24 p.m.?" (emphasis added).  As to Counts 65, 66 and 67, the fourth note

stated: "[P]lease provide activation [numbers] for each count as it is unclear which calls are intended or whether we have not been provided with these calls." Over defense objections that identifying specific calls was "moving into their deliberations" and "guid[ing] the jury," the district court responded "yes" for Counts 46, 47, 57, and 64. As to Counts 59 and 62, the district court responded: "The answer is that activation # [8806 and 13472] . . . [were] introduced into evidence and played in Court." On Counts 63, 65, 66, and 67, the district court stated for each Count: "The answer is that count [x] refers to consensual call [# y] on [z date], which was introduced into evidence and played in Court." For example, the district court stated: "The answer is that count 65 refers to consensual call #T-47 on May 8, 2004 at 4:40 p.m., which was introduced into evidence and played in Court."

Jury Note 5. On June 6, 2006, the jury asked about Racketeering Act 10(a), which the indictment listed as occurring "[o]n or about May 4, 2004." The jury note stated: "Two activations exist at this period in time (May 4, 2004), please clarify if this refers to activation # 980 [call at 5:24 p.m.] *or* T46 [call at 4:42 p.m.]?" (emphasis added) Over defense objection that answering the question would be improper since neither the indictment nor the verdict form referred to a specific call in Racketeering Act 10(a) and would delve into "what members of the grand jury meant when they indicted this case," June 6, 2006 AM Trial Tr. at 8, the district court told the jury: "The answer is activation # T46."

Jury Note 6. On June 14, 2006, the jury note asked the district court to "clarify the intended activation numbers" for Racketeering Acts 6(g) and 6(h), and to "please provide activation numbers for each call in [Racketeering] Acts 8, 9, & 10 as it is not clear for each of the [twenty-seven] subparts which call is intended." Defense counsel renewed their

objection and moved for a mistrial on the ground the district court's specific responses "allow[ed] the government an additional opportunity to argue their position to th[e] jury, the likes of which the defense cannot respond to." June 14, 2006 AM Trial Tr. at 16. Overruling the objection and denying a mistrial, the district court told the jury that Racketeering Acts 6(g) and 6(h) "are intended to allege activations 3591 for (g) and 3594 for (h)" and listed the "alleged activation numbers" for Racketeering Act sub-parts 8(a), 8(c)–(e), 8(g)–(o), 9(a)–(d), 9(f), and 10(c). The district court also told the jury that "activation 9860 in [Racketeering Act] 9(b) . . . was introduced into evidence but was not played in court, and it is now provided to the jury," and that Racketeering Acts 9(e) and 8(f) did "not involve an activation."

We observe preliminarily that Miller and Thomas present no argument in support of their Fifth Amendment due process claim, which appears only in an argument heading, and consequently it is not preserved. *See United States v. Hall*, 370 F.3d 1204, 1209 n.4 (D.C. Cir. 2004). Further, we need not address their contention that some responses to the jury notes resulted in an improper amendment of the superceding indictment, *see generally United States v. Mangieri*, 694 F.2d 1270, 1277 (D.C. Cir. 1982) (quoting *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C. Cir. 1969)); *see also United States v. Dickerson*, 705 F.3d 683, 694 (7th Cir. 2013), even if untimely raised in their reply brief, *see (George) Wilson*, 605 F.3d at 1035, because we are vacating potentially affected counts on other grounds.

When presented with factual questions from a deliberating jury, a trial judge must be careful not to "attempt[] to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused." *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573 (1977). This limit

on the trial judge's discretion ensures "independent jury consideration of whether the facts proved established" the crimes charged. *See Carella v. California*, 491 U.S. 263, 266 (1989). Both the Supreme Court and this court have elaborated on why "[t]his privilege of the judge to comment on the facts has its inherent limitations." *Quercia v. United States*, 289 U.S. 466, 470 (1933); *see United States v. Thomas*, 449 F.2d 1177, 1181 (D.C. Cir. 1971) (en banc); *see also Ayeni*, 374 F.3d at 1319–20 (Tatel, J., concurring). As in *Ayeni*, the issue "is not whether district courts have the discretion [to respond to jury questions] . . . but whether the court's action here fell within the scope of that discretion." *Ayeni*, 374 F.3d at 1316. "[A] trial judge is not a 'mere moderator,' but rather is charged with assisting the inexperienced laypersons who will render a verdict in understanding the nature and import of the often complex and always conflicting evidence presented at trial." *United States v. Duran*, 96 F.3d 1495, 1506 (D.C. Cir. 1996); *accord Quercia*, 289 U.S. at 469–70. At the same time, "[t]he influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his [or her] lightest word or intimation is received with deference, and may prove controlling.'" *Quercia*, 289 U.S. at 470 (quoting *Starr v. United States*, 153 U.S. 614, 626 (1894)). This court's analysis in *Ayeni* is instructive.

In *Ayeni*, 374 F.3d at 1314, the jury, after announcing it was deadlocked, responded to the district court's invitation to identify areas of disagreement and asked the district court two factual questions: (1) Why a handwriting expert had been called to testify, and (2) Whether the parties agreed that Ayeni's signatures in the witness voucher record books were authentic. Over Ayeni's objections, the district court allowed both sides to present supplemental arguments to the jury on these questions, and instructed before and after the supplemental arguments that the jury was not to "place undue emphasis on these supplemental arguments," but to consider them together with the

evidence, instructions, and other arguments the jury had heard. *Id.* (internal quotation marks omitted). On appeal, this court agreed with the government that the district court has broad discretion in controlling the jury during deliberations, including authority to decide what to do when a jury encounters stumbling blocks in its deliberations, but reversed the conviction, noting this discretion has limits. *Id.* at 1316 (citing *Brasfield v. United States*, 272 U.S. 448, 449–50 (1926) (trial judge cannot inquire about the numerical division of the jury) and *Thomas*, 449 F.2d at 1186 (trial judge may not give "*Allen*" charge to a deadlocked jury)). The court concluded that supplemental arguments were "an inappropriate response" because the judge could have answered the first question either by telling the jury that the handwriting expert was called because the parties disputed the authenticity of signatures or that the court could not answer the question because trial strategy was not a proper concern of the jury, and a complete answer to the second question was "no." *Id*. "Given these other options," the court held "it was an abuse of discretion for the district court to adopt an approach that, in effect, allowed the lawyers to hear the jury's concerns and then, as if they were sitting in the jury room themselves, fashion responses targeted precisely to those concerns." *Id.* The court noted that the prosecutor's supplemental argument included a new argument not made in closing and suggested an explanation for the expert's equivocation about the authenticity of the signatures that the expert had not offered. *Id.* Reversal of Ayeni's conviction was required, the court concluded, because "there is no way to know whether the supplemental arguments produced the jury's verdict." *Id.* at 1317.

The district court's responses to the jury notes in the instant case fall into two categories: confirming the identification in the jury note of what was intended by the charge in the indictment, and directing the jury to evidence previously unidentified by the jury as supporting the charge in the indictment. The line

between judicial clarification and impermissible judicial interference with the jury's fact-finding may not always be clear, and we do not doubt that jury questions can present "a difficult task" for the district court in "proceed[ing] circumspectly," *United States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978). We conclude the first category of response is less problematic than the second, but both were error.

The first category of response is illustrated by some of the district court's responses to Jury Notes 1 and 2 when the district court confirmed what the jury's notes had identified as the specific phone calls that the grand jury had intended to be associated with the indicted charges. Such confirmation likely eliminated possible confusion in a case involving thousands of phone recordings, racketeering counts with subparts, and differences at times between the date and time listed in the indictment and in the jury verdict form (*e.g.*, Counts 21, 34, 46, and 47). Also, in responding about Count 41, the district court eliminated confusion about a played call inadvertently not sent to the jury (activation # 3594) that matched the date and time listed in the indictment. Moreover, although the defense repeatedly objected to the district court's proposed responses, defense counsel did not disagree that the specific calls identified in the jury notes were properly associated with the questioned charges.

Still, the district court's "Yes" responses in effect told the jury that it need not look beyond the phone calls identified in the jury notes — which sometimes took place several hours earlier or later than the time listed in the indictment — in order to convict the defendants of those charged offenses. For example, in responding to Jury Note 1, the district court confirmed that the call in Count 19 was "meant to be" a call that occurred nearly 12 hours earlier than was listed in the indictment. The same was true of the responses regarding Counts 20 and 40. At

other times, the district court confirmed that the calls in Counts 21 and 34 were "meant to be" the specific calls identified by the jury, which occurred at the date and time listed in the indictment. Whether a call occurred "on or about" the date and time listed in the indictment was a factual question for the jury to resolve. In most instances, the specificity of the jury's questions may have minimized the risk that the district court improperly interfered with the jury's deliberations because the specificity indicated that the jury had focused on the identified call and had tentatively concluded that the grand jury intended the call to support the questioned count. *Cf. United States v. Harvey*, 653 F.3d 388, 398 (6th Cir. 2011). Even so, the notes did not disclose whether there was any disagreement among jurors about which calls supported which charges. It was error for the district court to endorse the jury's preliminary, possibly non-unanimous, interpretation of the indictment. *Cf. Quercia*, 289 U.S. at 470.

The second category of response is far more problematic because the district court directed the jury to evidence supporting the charges about which the jury inquired. This went beyond confirmation of the relevant phone call identified in the jury note. Instead, the district court provided the jury with facts about a specific call that the jury note had not already identified as supporting the questioned charge. In Jury Notes 3 through 6, the jury was asking to be told which calls were intended to support Counts 59, 62, 65, 66, and 67, and Racketeering Acts 6, 8, 9, and 10. A trial judge has discretion to decide whether and to what extent the jury may view transcripts of trial testimony, *United States v. (Ralph) Wilson*, 160 F.3d 732, 748 (D.C. Cir. 1998), and to provide instructions when a jury encounters stumbling blocks, *see United States v. Laing*, 889 F.2d 281, 290 (D.C. Cir. 1989); *United States v. James*, 764 F.2d 885, 890 (D.C. Cir. 1985). But that discretion does not extend to directing the jury to the evidence that supports a charged count

or racketeering act. The latter is advocacy, *see Blunt v. United States*, 244 F.2d 355, 365 (D.C. Cir. 1957), and "in words, substance and effect, unwittingly mandate[s] that certain facts — central to the prosecution's case — be taken as true," *United States v. Argentine*, 814 F.2d 783, 787–88 (1st Cir. 1987).

The district court's responses to Jury Note 3 are illustrative. For Count 59 charging Miller with unlawful use of a communication facility on or about April 15, 2004, at 6:30 p.m., the district court pointed the jury to activation # 8806, a call that took place six days before, on April 9, 2004, at 6:31 p.m. Absent that new fact, the jury reasonably could have found that a difference of six days between the time listed in the indictment and the time of activation # 8806 meant that activation # 8806 did not occur "on or about" (or "reasonably near," as the district court instructed) the time charged and the prosecution therefore had failed to meet its burden of proof on Count 59. The district court's response foreclosed that independent evaluation of the evidence by the jury. The same is true for Count 63 charging Thomas with unlawful use of a communication facility on or about May 4, 2004 at 5:20 p.m. In responding whether Count 63 was "meant to be [the call identified by activation] # 13554 May 4, 2004 5:18 pm," the district court directed the jury to call # T-46, which took place on May 4, 2004, at 4:42 p.m. Although the time difference is not as great as in Count 59, it was for the jury to decide whether call # T-46 supported Count 59 or, instead, did not occur "on or about" the time listed in the indictment; it reasonably could have focused instead on other calls that took place closer to the time listed in the indictment. Other responses to Jury Notes 3, 4, 5, and 6 also reflect that the district court directed the jury to the evidence of a call that the jury notes had not previously identified to support a charge. In response to Jury Notes 3 and 4 the district court identified the "the intended call[s]" for Counts 59 and 62 and the calls that Counts 65, 66 and 67 "refer[red] to." In response to Jury Note 5 about which

of two calls supported Racketeering Act 10(a), the district court told the jury which call was intended. The same type of response occurred for Jury Note 6, with the district court telling the jury which specific calls were intended for each of several racketeering act sub-parts.

More troubling still, the record indicates that in both categories of responses the district court was conveying the prosecution's view of what calls the grand jury intended to support the counts and racketeering acts mentioned in the jury's notes. The parties and the district court were bound by the four corners of the indictment in ascertaining the grand jury's intent. Once deliberations had begun, it was the jury's exclusive province to interpret the intended scope of the indictment in deciding whether the prosecution had met its burden of proof on each charged offense. *Cf. United States v. Evanston*, 651 F.3d 1080, 1086–88 (9th Cir. 2011); *Argentine*, 814 F.2d at 787. By conveying the prosecution's view of the grand jury's intent, the district court improperly permitted the prosecution to make a supplemental argument to the jury. *Cf. Ayeni*, 374 F.3d at 1316.

The government maintains that Miller's and Thomas' objection to the responses "rests on a misunderstanding of what the district court actually did." Appellee's Br. 96. In responding to the jury's questions, the government insists that the district court "did not 'assist[] or coach[]' the jury by providing the government's view of what evidence was generally 'relevant' to the jury's consideration of the charges. Instead, the court was *ensuring that the jury understood what the charged conduct actually was*, so that the jury could evaluate that conduct in the light of all of the evidence." *Id.* (alterations in original) (emphasis added) (citations to Appellants' Brief omitted). This characterization, however, highlights what was impermissible about the district court's responses: In responding to questions regarding the various counts and racketeering acts,

the district court was instructing the jury on the specific phone calls that the grand jury intended to support specific offenses. And, to the extent the district court conveyed the prosecution's view of "what the charged conduct actually was," *id.*, the district court permitted an inappropriate supplemental argument by the prosecution, *see Ayeni*, 374 F.3d at 1316. The prosecution's opportunity to assist the jury in analyzing the evidence was during closing argument. *Cf. Moore*, 651 F.3d at 52–53.

We note that the government has not argued that the district court's responses were proper because the superceding indictment charged specific offenses "on or about" certain dates and times and the prosecution simply decided to drop alternative evidence that fit those times in order to ensure jury unanimity. During oral argument the government expressly declined to advance this line of reasoning, and the court therefore has no occasion to determine its validity. Instead, the government insisted that the district court's responses properly instructed the jury about the grand jury's intent. But an instruction about the grand jury's intent was not proper because there was no evidence beyond the four corners of the superceding indictment of what that intent was.

We hold that in responding to the jury's notes the district court abused its discretion by instructing the deliberating jury on the grand jury's intent on the tainted charges. The first category of response was in the nature of confirmatory agreement, while the second category was in the nature of affirmative advocacy. Although different as a matter of degree, both types of responses were error and neither was harmless. Other options were available to the district court, for instance instructing the jury that the court could not answer questions seeking confirmation of the grand jury's intent, because the jury had to decide for itself whether the prosecution had met its burden of proof. The government's

suggestion of harmlessness, because "the [district] court did no more than identify properly admitted evidence, and specify which charge it related to, without further comment," Appellee's Br. 99, does not accurately reflect the dialogue that occurred. Moreover, a general instruction, such as the district court gave in responding to Jury Notes 3 and 4, that the jury may use any evidence it deems relevant in determining whether the elements of the offense have been proved beyond a reasonable doubt, is inadequate to cure the harm. Given the district court's imprimatur, *see Quercia*, 289 U.S. at 470, regarding the phone calls supporting the charges about which the jury inquired, "there is no way to know whether the [district court's responses] produced the jury's verdict," *Ayeni*, 374 F.3d at 1317, on those charges.

Accordingly, we vacate Miller's convictions on Counts 19, 20, 34, 40, 46, and 59 and Thomas' convictions on Counts 46, 47, 63, 64, 65, 66, and 67. We do not vacate Count 41 because the district court's response was purely administrative, providing the jury with the played call identified in the jury note that inadvertently had not been sent to the jury prior to its commencement of deliberations. Although the district court's responses tainted Racketeering Acts 6, 8, 9, and 10, which must be vacated, Thomas' RICO conspiracy conviction is supported by the guilty verdicts on Racketeering Acts 1 and 5, *see supra* Part VI, which show the requisite pattern of racketeering activity, *see United States v. (Gregory) Thomas*, 114 F.3d 228, 250–51 (D.C. Cir. 1997) (citing 18 U.S.C. §§ 1961(5), 1962).

## IX.

**Effect of Cumulative Errors**. Contrary to their contention, the errors did not "exert a cumulative effect such as to warrant reversal" of all of Miller's and Thomas'

convictions. *See Brown*, 508 F.3d at 1076 (quoting *United States v. Jones*, 482 F.2d 747, 749 n.2 (D.C. Cir. 1973)). The government's evidence on the charges of which Miller and Thomas were convicted consisted, among other things, of their own incriminating words and actions as captured in the tape recordings of numerous phone calls and further corroborated by the seized physical evidence. The district court's errors in admitting overview, lay opinion, and co-conspirator statement testimony, combined with the prosecution's submission of unplayed and unredacted tapes to the jury contrary to the district court's ruling, do not diminish the strength of this evidence. Limiting cross-examination of the cooperating witness on two occurrences thirty years ago was not error, and the errors in responding to the jury's notes were confined to the specific charges that we are vacating. Viewed cumulatively, the errors do not demonstrate that Miller and Thomas were "so prejudiced," *Egan v. United States*, 287 F. 958, 971 (D.C. Cir. 1923), as to deny them a fair trial. *See Celis*, 608 F.3d at 847 (citing *Egan*, 287 F. at 971).

## X.

**Thomas' Life Sentences**. The jury convicted Thomas of conspiracy to distribute and possess with intent to distribute 500 grams or more, but less than five kilograms, of cocaine. The maximum statutory term of imprisonment for that quantity is forty years. 21 U.S.C. § 841(b)(1)(B). At sentencing, the district court "credit[ed] Tyrone['s] testimony that the conspiracy was for five [kilograms]," Nov. 28, 2007 Sentencing Tr. at 6, and upon applying a sentencing guidelines range of thirty years to life for narcotics conspiracy, sentenced Thomas to life terms. Thomas challenges these sentences, and the government has conceded the error:

> The government agrees that appellant Thomas's life sentences for narcotics conspiracy (21 U.S.C. § 846) and RICO conspiracy (18 U.S.C. § 1962(d)) were entered in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the district court imposed a sentence beyond the statutory maximum authorized by the jury's findings as to the amount of cocaine for which Thomas was responsible.

Appellants' Reply Br. 2 n.1 (stating that government requested its concession appear in the Reply Brief).

Accordingly, we vacate Miller's convictions on Counts 19, 20, 34, 40, 46, and 59 and Thomas' convictions on Counts 46, 47, 63, 64, 65, 66, and 67. In view of the government's concession, we also vacate Thomas' life sentences for narcotics conspiracy and RICO conspiracy, and we remand for resentencing of Thomas, *see United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005). Otherwise we affirm the judgments of conviction.